HARLEY CARTER v. THOMAS P. BURNS, Administrator of the estate of DILLON TURNEY, Appellant.—61 S. W. (2d) 933.

Division One, June 12, 1933.*

---

*NOTE: Opinion filed at October Term, 1932, March 16, 1933; motion for rehearing filed; motion overruled at May Term, June 12, 1933.

*Starr & Jordan* and *Thomas P. Burns* for appellants.

*Ralph H. Munro, Otho F. Matthews, H. K. West* and *Gilbert Lamb* for respondent.

HYDE, C.—This is an action at law in four counts to enforce an agreement to assume and pay four notes, each of which was secured by a deed of trust on a farm of 1418.87 acres in Chariton County. It was tried before the court without a jury. At the same time there was pending an action in equity to compel the release of a prior deed of trust on the farm. That case, Carter v. Burns, administrator, 61 S. W. (2d) 944, is decided concurrently herewith. Both cases were tried at the same time, but were not consolidated, in the circuit court. Evidence was first taken in the equity case, which showed that Ellsworth Turney, of Fairfield, Iowa, owned the farm in 1917; that he then owed $47,000 to the Mutual Benefit Life Insurance Company, which was secured by a first deed of trust on 1208.87 acres of the land; and that he owed $5,000 to Bartlett Brothers Land and Loan Company which was secured by a first deed of trust on the remaining 210 acres. During the next two years Ellsworth Turney nearly doubled this mortgage indebtedness. On the first day of June, 1917, he executed a deed of trust on the farm securing his note for $19,378.75, due June 1, 1920, to respondent and

Fred W. McClain, both also of Fairfield. It was the subject of the equity action. Thereafter, he executed the four notes, which were those involved in this law action, also secured by deeds of trust on the farm. The first of these was executed July 7, 1917, and secured his note to Fred W. McClain for $4,500 due July 7, 1920. On September 10, 1917, he executed another deed of trust on the farm securing his note to respondent for $1,600 due September 10, 1920. On the fourth day of January, 1919, he executed another deed of trust on the farm securing a note of $5,000 to Thomas C. Allen, due January 4, 1922, and on June 10, 1919, he executed still another deed of trust securing a note for $6,000 to respondent due June 10, 1920.

The first mortgages ($52,000 total) on the farm came due March 1, 1921. All of the other mortgages, except the Allen mortgage, were past due at that time. Ellsworth Turney had tried to get increased first mortgage loans, to take up the subsequent mortgages, but failed. In this effort he had been assisted by respondent who wrote Bartlett Brothers about it. On February 28, 1921, the defendant Dillon Turney, brother of Ellsworth Turney, had a conversation with respondent and McClain at respondent's office concerning Ellsworth Turney's affairs. There were two versions of what was said at that time. Respondent's version was that Dillon Turney said: "We are trying to get a loan and fell down and didn't get it. . . . I don't want you to foreclose on that . . . if I can get the deed to the farm I will pay these mortgages off;" that Dillon Turney called Ellsworth Turney in and told him "if you deed me that farm I will pay off these mortgages and deeds of trust and junior loans and I will get the $52,000 renewed;" that "Mr. Dillon Turney said he would pay them off if he could get the deed to the farm and I was willing as far as I was concerned to have the deed made to (Dillon) Turney;" and that "after they agreed to that Mr. Ellsworth Turney agreed to deed him the farm, and they went out and he (Dillon) says 'I will see you people in a few days.'" Ellsworth Turney did make a deed to the farm and delivered it to Dillon Turney on that date. Ellsworth Turney's wife would not sign the deed until she first talked to Dillon Turney. (It will be noted that respondent testified as to Dillon obtaining a deed, with his approval, and not of buying the land, for any fixed amount, from his brother.) Dillon Turney's version was as follows:

"I had this discussion with Fred (McClain) and told him I didn't care to get myself mixed up with it. Fred knew Ellsworth hadn't been keeping his interest payments up with Bartletts, and Fred suggested to me I take over a deed and go to St. Joe and see what arrangement I could make with Bartlett Brothers. I told him I would not ask Ellsworth for the deed. 'Well,' he says, 'We will ask him

for it,' so Fred and I went to Carter's garage and Ellsworth was called. Carter and McClain stated the situation to Ellsworth. The next day was the first of March, when this loan of $52,000 was due. No arrangements had been made for refinancing, and they suggested to Ellsworth and urged that he give me the deed, stating that it would be only temporary, and for me to go to St. Joe and see what could be done. I did not join in the urging, for I told them I would not urge him to give me a deed, that was up to him. . . .

"Q. During the conversation was anything said about the taking care of these junior liens on the land, and, if so, what was said? A. Only this, if I could get an increased loan it would be necessary to have new papers made and they would get their money."

Dillon Turney went the next day to St. Joseph, Missouri, to the office of Bartlett Brothers Land and Loan Company who represented the holders of the two first mortgages. He made arrangements to renew them for five years and returned to Fairfield. Pursuant to this arrangement, he left his deed to the farm with Bartlett Brothers, to be forwarded to Chariton County for recording, and later personally assumed the payment of both first mortgages by written renewal agreements. The next day after his return from St. Joseph, March 3, 1921, respondent gave him a list of the mortgages on the farm with the interest calculations on each. Dillon Turney, Ellsworth Turney and their mother were partners (with one Montgomery) in the firm of Joel Turney & Company, which manufactured Charter Oak farm wagons. Dillon Turney testified that respondent brought this list to his office at the wagon factory. Respondent said that Dillon Turney came to his office and asked for it and that while there he said: "I have got the deed to this farm, and you hold off on these foreclosures now. *Don't go ahead on these foreclosures now and I will pay them.* I will pay a part of them in a day or two, and I will pay the balance in a short time."

Dillon Turney denied that he then or at any other time said he personally would pay any of the mortgages given by Ellsworth Turney which respondent, McClain or Allen, held. Dillon Turney, on the same day, March 3, 1921, wrote the following letter to respondent:

"Fairfield, Iowa, U. S. A.,
"March 3, 1921.

"Harley Carter,
"City.
"Dear Sir. I have checked over the list of notes left with me this afternoon, and find I can do the following at this time.

| | |
|---|---:|
| Pay Interest on Allen note of | $ 5,000.00 |
| ,, ,, ,, your ,, | 19,378.75 |
| ,, your note in full for | 6,000.00 |
| ,, ,, ,, ,, ,, ,, | 1,600.00 |
| ,, McClain note in full for | 4,500.00 |

"I feel I should keep my promise to Mrs. Turney to pay mortgages on home.

"If collections improve as they should I can pay a part on $19,-378.75, even though I am delayed in getting loan increased for several months.

"I desire to get yours cleaned up just as soon as possible, but there is a limit where I can go at this time. Kindly explain this to Fred and Mr. Allen.

"Have interest figured, and I am asking as a favor that 6% be used, for I am the one that stands to lose in the end.

"I cannot hope to make anything and would not if I could, only stepped in to protect local friends from any loss.

"Come up Sat. afternoon, with papers and releases properly executed to cover the 3 notes and Trust Deeds as listed.

"Yours Truly,

"(Signed) D. TURNEY.

"P. S. After the above is paid I figure I will have paid out about $27,500.00 in place of $25,000 as planned."

In response to the letter respondent and McClain went, on March 5, to Dillon Turney's office at the wagon factory. Again, there is a dispute as to what was said. Respondent testified as follows:

"We went up there on March 5th and got there, and we talked there on what he had figured up to pay and what the interest and principal on the $19,000 made, and a few thousand dollars more than what he said he would be able to pay at that time in the letter, and so I was wanting him to pay off more and he says 'I will pay off this $19,000 note and just clean that out of the way and get rid of that and pay that note off.'

"Q. What did he say about the other notes? A. He said he would pay the balance of them just as soon as he could get ahold of the money, in a short time he would clean up the rest of them."

Dillon Turney, however, said that the conversation was as follows:

"Q. All right. What did you say to them you would do, if anything, or what happened after that? A. Well, they were discussing—you know—the amount of money each was going to get in that letter. I told them my talk with Ellsworth would necessarily change my plans, but as I didn't suppose it made any difference where the money came from that we—the firm would take over this $19,000 note.

"Q. By 'we' you mean, I assume, the firm Joel Turney & Company? A. Yes, sir. . . .

"Q. What did they say? What did Carter or McClain say, if they said anything? A. They said that it would be satisfactory."

Dillon Turney did not make the payments he stated he would make, in his letter of March 3, 1921, but instead gave respondent and McClain each a check for $10,755.46. The total of these two checks was

the amount due on the mortgage note of $19,378.75, owned by respondent and McClain, including accrued interest. This note and the mortgage securing it were delivered at that time to Dillon Turney. On the back of it appeared the blank indorsements of respondent and McClain. It was shown, however, that these indorsements were put on the note about two years before, when it was held as collateral, by a bank in Fairfield, for their obligations. The list of notes with the calculation of interest due on each, which the parties had before them on March 5, showed that the amount necessary to pay the interest on the $19,378.75 mortgage note to that date and to pay off all other mortgages, including the one not due, was $21,462.29, while the amount of that note and accrued interest was $21,510.93. The amount necessary to make the payment set out in Dillon Turney's letter was $16,462.29. Respondent's theory was that Dillon Turney was paying off the largest mortgage rather than the smaller subsequent mortgages, which totaled less than the amount due on it. He testified that Dillon Turney agreed to release it on the record when he went to Missouri. He said that after he found out that the release had not been made he frequently insisted that it be released, but that Dillon Turney kept putting him off. He finally attempted to release it himself by recording a release deed and affidavit of lost note. which he and McClain signed.

Dillon Turney claimed that, instead of paying off the note himself, the firm of Joel Turney & Company purchased it. He said that Ellsworth Turney had an interest in the business at the time amounting to about $30,000; that, by his letter of March 3rd, he meant that he was going to pay the notes out of Ellsworth's money; but that Ellsworth owed the firm a large amount so he changed his mind and decided to purchase the large note for the firm. He denied that he ever agreed to release the trust deed, but said that two or three months after March 5, 1921, plaintiff "came up to the office one day and wanted to know about releasing this deed of trust in Missouri. I told him I would release it when we got their money." McClain. in the main, corroborated Dillon Turney's testimony. One of respondent's employees corroborated, in part, what respondent testified was said in his office by Dillon Turney. At the time of the trial plaintiff was the owner of the four notes and mortgages subsequent to the one he sought to cancel. Dillon Turney had brought suit in Iowa against respondent on his indorsement on the $19,378.75 mortgage note, but did not sue McClain.

All of the evidence in the equity case, showing the facts above stated, was, by stipulation, put in evidence in this case. After offering the evidence in the equity case, respondent offered nothing further except the notes which he owned. Defendant had as additional evidence the depositions, taken by respondent, of Ellsworth

Turney and his wife. They both testified that Dillon Turney was not buying the farm, but that it was deeded to him so he could negotiate with Bartlett Brothers for an increased loan or extensions of the first mortgages; that Ellsworth Turney was not in good standing with Bartlett Brothers because he had been delinquent in his interest payments; that there was no agreement between them and Dillon Turney that he would personally pay the notes secured by the subsequent mortgages; that Dillon Turney was trying to save the farm for them; and that anything left was to be theirs. Respondent testified in rebuttal concerning subsequent conversations with Dillon Turney in which he said he asked further forbearance on the past due mortgages. Both parties also offered in evidence Iowa laws on limitations.

Respondent's petition, in the law action, in each count made the following allegations concerning the assumption agreement, upon which he sought to recover from defendant the amount of each of the four notes:

"Plaintiff further states that on or about the 1st day of March, 1921, the defendant herein agreed with the plaintiff and Fred W. McClain that *if the said Fred W. McClain and this plaintiff would not foreclose certain mortgages against real estate that he held,* which real estate was formerly the real estate of Ellsworth Turney and Alice B. Turney and which real estate was given in a deed of trust to secure the note in question, that *he would become personally liable to the said Harley Carter for the note in question and the other notes* held by the said Harley Carter and signed by Ellsworth Turney and Alice B. Turney, and a note held by Thomas C. Allen, and a note held by Fred W. McClain, and that he would pay them in a short time.

"Plaintiff further states that thereafter, *on the 3rd day of March, 1921, the said defendant agreed to take up and pay off the note herein sued on and pay off the other notes above mentioned* or the interest thereon. Plaintiff further states that on the same day or a day or so later, the defendant agreed to hold himself personally responsible for the said notes and notified or told the said parties that he had purchased the real estate in question. . . .

"Plaintiff further states that they have held off the foreclosure of said notes for nearly ten (10) years lacking a few days on the strength of promises made by the said Dillon Turney, the defendant herein, and the said Dillon Turney has not as yet paid off said notes or the interest on the same and that the whole amount of said note and interest, as aforesaid, with the exception of the two years' interest endorsed thereon, is due and payable.

"Plaintiff further states that *all of the aforesaid notes were secured by mortgages and deeds of trust on real estate in Chariton County, Missouri, and the defendant in purchasing said real estate assumed*

*the obligations existing by reason of said mortgages and deeds of trust thereon and* the said plaintiff and the said McClain and other parties were threatening to foreclose said notes and the agreement made by the defendant to pay the said notes was made by him to prevent and induce the said plaintiff and others holding said notes to refrain from foreclosing said notes and to give the said defendant more time in which to pay the same.

"Plaintiff states that the assumption of the indebtedness evidenced by the note hereinabove referred to was a part of the consideration of the purchase price of the land hereinabove mentioned when said land was deeded by Ellsworth Turney and his wife to the defendant, Dillon Turney, and that the plaintiff is informed and believes that said agreement to assume and pay said debt was a parol agreement between the grantors and grantee of said deed. *Plaintiff further states that the agreements to pay said indebtedness made by the defendant in consideration for* the extensions of time and *agreements not to foreclose or press collection referred to herein were parol agreements and not in writing.*"

Defendant's answer, in addition to a general denial, specifically denied any assumption agreement, pleaded the State of Limitations of Iowa and the Statute of Limitations of Missouri and also the Statute of Frauds. Respondent's reply set up other provisions of the Iowa Statute of Limitations and decisions of the Supreme Court of Iowa which he alleged permitted this suit within the time it was brought. The court found against respondent on the first count based upon the $4,500 note payable to McClain, but found for respondent on the other three counts. Dillon Turney appealed from the judgment entered but died about one year after taking his appeal.

On December 19, 1931, more than six months after the death of Dillon Turney, a bill of exceptions was signed by the trial judge, which was on January 5, 1932, marked filed, by the clerk. No suggestions of the death of Dillon Turney were filed until August 15. 1932, at which time Thomas P. Burns filed such suggestions, with a certified copy of letters dated August 12, 1932, showing his appointment as administrator of the estate of Dillon Turney by the Probate Court of Linn County, Missouri, and asked that the cause be revived against him as such administrator. Administrators had been appointed for the estate of Dillon Turney in Jefferson County, Iowa, in June, 1931, and his estate was in the process of administration there. Respondent filed a motion to dismiss the appeal in this case, which has been taken with the case, on the grounds that no one had any authority to file the bill of exceptions because no administrator had been appointed in Missouri; that the cause had not been revived at that time; and that, even if the filing was authorized, the abstract of the record did not show an order for the filing of the same nor that the same was filed, from record entries in the clerk's

office. Even if there was no bill of exceptions in the record, the appeal in this cause, having been properly revived in this court, would be for hearing on the record proper. The motion to dismiss the appeal is therefore overruled.

■ Since respondent raises these same points in his brief, we will consider them to determine whether our review in this case must be limited to the record proper. Prompt action to revive and a better abstract of the record would have eliminated these questions and conserved the time of this court. We do not, however, feel that a consideration of the merits should be denied on these grounds. It is true that the authorities cited by respondent hold that where a party to an action dies after judgment, the authority of his attorney is terminated and to prosecute an appeal, or otherwise act in the case so as to bind anyone, he must obtain authority by employment by the deceased's personal representative. [Prior v. Kisko, 96 Mo. 303, 9 S. W. 898; Crawford v. C. R. I. & P. Ry. Co., 171 Mo. 68, 66 S. W. 350; C. R. I. & St. P. Ry. Co. v. Woodson, 110 Mo. App. 208, 85 S. W. 105; McCormick v. Shaughnessy (Idaho), 114 Pac. 22, 34 L. R. A. (N. S.) 1188, and note.] ■ However, if a bill of exceptions is allowed and filed prior to revivor in this court and the substituted administrator thereafter desires to adopt it, we see no good reason why the opposite party, who has stipulated that it was correct and could be filed, should be entitled to complain. Our statute leaves it to the excepting party to "write his exceptions and pray the court to allow and sign the same," but it does not say that the judge cannot do so. [Sec. 1008, R. S. 1929.] It has been held that, while it is not his duty to do so, "it is not improper or illegal for a trial judge to prepare a bill at the request of the counsel in the cause, if he so desires, and he may upon his own motion, make up the bill." [4 C. J. 247, sec. 1854; see, also, 2 R. C. L. 141, sec. 113.] Since we have had official court reporters in circuit courts, who are required to take all testimony, objections, rulings, and exceptions, and furnish transcripts thereof (Sec. 11719, R. S. 1929), bills of exceptions have, as a matter of practice, usually been written entirely by the official reporter. There is a certificate of the official reporter on this bill.

■ Of course, no judgment or other order affecting the merits can be entered, before revivor, which would be binding upon those who are the successors in interest of the deceased party. [Childers v. Goza, 1 Mo. 394; Murphy v. Redmond, 46 Mo. 317; Gamble v. Daugherty, 71 Mo. 599; Rogers v. Tucker, 94 Mo. 346, 7 S. W. 414.; Wilson v. Darrow, 223 Mo. 520, 122 S. W. 1077; Cole v. Parker-Washington Co., 276 Mo. 220, 207 S. W. 749; 1 C. J. 21, sec. 440; 1 R. C. L. 22, sec. 14.] But "an action does not abate *ipso facto* by the death of a party. There must be a suggestion of such death to

the court to effect an abatement.'' [1 C. J. 172, sec. 293.] [5] Under our statute, it does not abate until three terms of court have passed after suggestion of death without motion for revivor. [Sec. 891, R. S. 1929.] This is true whether the cause is in the circuit court or in the Supreme Court. [State ex rel. Porter v. Falkenhainer, 321 Mo. 613, 12 S. W. (2d) 481.] ''For the purpose of preventing injury to the surviving parties where those entitled omit to revive, to preserve the property which is the subject of the suit, or to punish for a breach of injunction'' proceedings may be taken before revivor. [1 C. J. 221, sec. 442.] ''The office and purpose of a .bill of exceptions is to preserve in, and make a part of, the record such matters as transpire in the progress of a trial, which otherwise would not become a part thereof.'' [4 C. J. 217, sec. 1816.] ■ In settling and allowing a bill of exceptions, a trial court is merely completing its own records. It is ''a part of the inherent jurisdiction of that court to complete the full record of the trial in that court.'' [Crawford v. C. R. I.·& P. Ry. Co., supra, 171 Mo. l. c. 76, 66 S. W. 350.] That is the reason the trial court can allow a bill of exceptions in a case after it has lost all other jurisdiction therein by reason of it being in a higher court on appeal. At common law (see 4 C. J. 250, sec. 1856) and until recently under our statute (see Laws 1911, p. 139), a bill of exceptions could not be allowed except at the term the judgment was rendered or within the time thereafter, which was by order allowed or which by stipulation was agreed upon by the parties. Originally exceptions had to be settled and signed by the trial judge on the trial before verdict, or before the jury was discharged. [4 C. J. 267, sec. 1880.] ■ Under our present statute (Sec. 1009, R. S. 1929) what was originally required to be done by the trial court to complete its records, at the term the judgment was rendered, may be done (to the convenience of all) ''at any time before the appellant shall be required by the rules of such appellate courts respectively to serve his abstract of the record.'' We, therefore, will consider the bill of exceptions part of the record in this case where respondent's attorneys entered into a written stipulation that the bill of exceptions was true and correct and might be filed and made a part of the record in the cause; where the official reporter certified it was complete and correct; where the bill was signed and allowed by the court when no suggestions of death had yet been made; where the resident administrator was thereafter properly appointed and the cause revived in his name in this court before hearing; and where such administrator desires to adopt such bill of exceptions as correct and binding upon him and presents to this court the record in the cause containing such bill of exceptions.

As to respondent's contention that the filing of the bill of exceptions was not shown, there is nothing in the record to show that it

was filed in term time. Under our present statute (Sec. 1009, R. S. 1929), "bills of exceptions may be allowed by the trial court or the judge thereof in vacation." "It is no longer necessary, as a condition precedent to the filing of a proper bill of exceptions in vacation, to obtain leave for such filing in term time." [Brockman v. United Rys. Co., 271 Mo. 696, 197 S. W. 337; see, also, State ex inf. Conkling v. Sweaney, 270 Mo. 685, 195 S. W. 714.] Long ago this court stated the rules, concerning the necessary showing of the filing of a bill of exceptions, as follows:

"If filed in term time, the record of the court should prove the fact. Nothing short of this will suffice. [Pope v. Thomson, 66 Mo. 661.] If filed in vacation, the fact must be evidenced by the indorsement of the clerk of the filing on the bill of exceptions." [Carter v. Prior, 78 Mo. 222, l. c. 226.]

In a subsequent case, it added:

"The clerk's indorsement upon the bill of exceptions is but his certificate to the fact that it was filed, and his certificate, whether on the bill or elsewhere, if it identifies the bill as the one filed, we hold sufficient." [Ferguson v. Thacher, 79 Mo. 511, l. c. 514.]

More recently, in State ex rel. C. P. & St. G. Ry. Co. v. Turner, 270 Mo. 49, 191 S. W. 987, this court approving the same case in the Springfield Court of Appeals, 177 Mo. App. 454, 163 S. W. 951, and disapproving Callier v. C. P. & St. G. Ry. Co., 158 Mo. App. 249, 138 S. W. 660, to the contrary, held that the filing of a bill of exceptions could be shown in some other manner if the clerk neither wrote any notation of its filing upon the bill nor elsewhere.

In State v. Stamper, 314 Mo. 635, 285 S. W. 437, this court reviewed the authorities from Carter v. Prior, supra, down to date and after quoting the statement, quoted above, from that case, said: "We find no ruling of this court that conflicts with that statement of the law." This court further said in the Stamper case: "There is nothing in the record to show that the term continued to that date (of filing), and, assuming that the clerk did his duty, we will presume that the bill of exceptions was filed in vacation."

The bill of exceptions here shows the filing by a certificate of the clerk indorsed upon it. As above noted there is shown as a part of the bill a stipulation (undated), signed by all the attorneys in the case, that it is true and correct. The abstract recites that the bill of exceptions "was duly filed." (See Rule 31 of this court.) The bill of exceptions also shows the following:

"Certificate of trial judge.

"And now on this the 19th day of December, 1931, and within the time by the court granted for filing the same, comes the defendant and tenders this, his bill of exceptions, in the above entitled cause, and prays that the same be signed by the judge of this court, filed

with the clerk thereof and made a part of the record in said cause, which is accordingly done, this the day and year last above written.

·"Paul Van Osdal,
"Judge of the Circuit Court of Linn County, Missouri."

The certificate of filing is also shown in the record proper after which appears the statement "The bill of exceptions is as follows." The bill is then set out, under the caption of the case, separate from the record proper. There seems to be no question as to the identification, authentication, or correctness of the bill before us. [See Wilkerson v. Wann, 322 Mo. 842, 16 S. W. (2d) 72, l. c. 75; Gage v. St. Louis Transit Co., 211 Mo. 139, l. c. 149, 109 S. W. 13; Sheppard v. Wagner, 240 Mo. 409, l. c. 431, 144 S. W. 394; Rule 13, Supreme Court.] We, therefore, hold that the entire record is before us and we will proceed to the consideration of the questions raised by appellant.

█ Since this is a law action we cannot pass upon the weight of the evidence and are bound by the facts found by the court, in the special finding of facts it made, and supported by substantial evidence. The court found that Ellsworth Turney and wife conveyed the farm to Dillon Turney by a deed which contained no assumption clause, but made no finding as to any oral agreement between them that Dillon Turney assumed and agreed to pay respondent's notes as a part of the consideration for the deed. █ The court did not directly state that it found that Dillon Turney promised respondent that he would assume and pay the subsequent mortgage notes, but the facts it did find, in its finding of facts, indicate that its conclusion was that there was an agreement between him and respondent for assumption of all of them except the one described in respondent's first count. The court must have so found because its conclusions of law and its verdict leave no other basis for its decision. Declaration No. 3 was as follows: "The court declares the law to be that under the law and the evidence there was no parol contract of assumption of a mortgage indebtedness represented by the note in Count One of plaintiff's petition." This declaration related to the $4,500 note given McClain who testified that Dillon Turney did not personally agree to pay it or any of the other notes, as a part of the purchase price for the conveyance from his brother or otherwise. This note was in fact (after the $19,378.75 note was paid) the second mortgage on the farm. The other notes, which respondent owned, were third, fourth, and fifth mortgages. If there had been an agreement between the Turney Brothers that Dillon Turney assumed the payment of all mortgage notes as a part of the purchase price of the farm respondent (now owner of all the notes) would have been entitled to enforce it as to all the notes and therefore to recover on the first count. [Mc-

Farland v. Melson, 323 Mo. 977, 20 S. W. (2d) 63, and cases cited; 19 R. C. L. 375, sec. 145; 41 C. J. 743-745, secs. 805-809; 47 A. L. R. 339, note; 21 A. L. R. 439, note.]

However, the trial court decided that respondent could not recover on his first count, found for Dillon Turney thereon and gave declaration of law No. 3 so stating. This clearly shows that the court found that Dillon Turney did not agree with his brother to assume all the mortgage notes as a part of the purchase price of the farm, which was the only agreement claimed to have made between them. Respondent's claim, both in his pleadings and proof, was that the assumption agreement between the Turney brothers covered all the mortgage indebtedness. It was never claimed that the Turney brothers made an agreement between themselves at the time of the conveyance that only the notes owned by respondent should be assumed by Dillon Turney. That would certainly be a peculiar agreement in view of the fact that McClain's note was secured by a mortgage prior to those held by respondent. Furthermore, all of the other declarations of law given by the court concern an agreement between Dillon Turney as owner of the land and the owners of the mortgage notes, and in fact respondent's petition and evidence seems to indicate that he was relying upon an agreement he claims Dillon Turney made with him (whether made before or after the deed from Ellsworth), rather than an agreement between the Turney brothers.

We do not think that the court could have found from the evidence that an assumption agreement was made between the Turney brothers as part of the purchase price of the conveyance, in view of the circumstances of the transaction as disclosed by the testimony of McClain, Ellsworth Turney and his wife Alice B. Turney (all witnesses of respondent either at the trial or by deposition), and in view of the fact that even the testimony of respondent himself does not show that there was actually a sale of the land by Ellsworth Turney to his brother. If the transaction between them was not a sale, there could not have been an agreement between the Turney brothers that Dillon Turney assumed and agreed to pay mortgages as a part of the purchase price of the farm. No one testified that there was any purchase price agreed upon between them, although the court found the land was then worth about $50,000 more than the total of all the mortgages. If he was not buying the farm but was merely taking title for the purpose of aiding his brother Ellsworth to work out his financial difficulties (the letter of March 3, 1921, to Carter strongly indicates this) then there was no agreement for assumption of the mortgages, as a part of the purchase price of a sale, shown to have been made between them. At any rate, whatever the transaction was, there really is no substantial evidence to controvert the claim of all of the Turneys that Dillon Turney did not agree with his brother as

a part of any consideration of a sale to pay the notes sued on. Not only does McClain corroborate this, but respondent himself said that Dillon Turney's first conversation with him, before the deed was made, was about aiding Ellsworth to get a loan to pay the past due mortgages and their failure to raise the money, and that he then requested him not to foreclose. Respondent's testimony further discloses that Ellsworth Turney's financial condition had become almost hopeless; that he had defaulted in his first mortgage payments and had thereby impaired his standing with the holders; and that respondent himself had been actively engaged in attempting to obtain new credit and refinancing for him months before a conveyance to Dillon Turney was ever mentioned. It is apparent that the deed from Ellsworth to Dillon Turney was brought about, in a large measure, by the efforts of respondent and the other mortgage creditors. It would seem that any agreement to pay the mortgage indebtedness was of greater benefit to them than to Ellsworth and that they, rather than Ellsworth were seeking to obtain such an agreement from Dillon Turney.

This court has held that the evidence, to establish an oral assumption contract between grantor and grantee, must be clear and convincing, "and that it must be made to appear that the parties agreed—that there was a meeting of minds—on the proposition that the grantee should make the mortgage debt his own, or else circumstances proven must be such as to estop the grantee from denying liability, in which case the law implies a promise on his part." [McFarland v. Melson, 323 Mo. 977, 20 S. W. (2d) 63, l. c. 66 (a law case).] If any higher standard than the most strained inference in respondent's favor is to be required to make a submissible case on such an issue, respondent certainly did not meet the test. Our conclusion is that the evidence on this issue was not sufficient and that must have been the view of the trial court. Respondent, can, therefore, prevail only upon an assumption agreement between himself and Dillon Turney.

Appellant contends that respondent was not entitled to recover because there was no consideration for such an assumption agreement; because it was barred by the Statute of Limitations; and because it was unenforceable under the Statute of Frauds. Whether there was sufficient consideration to make a valid contract must be determined by the law of Iowa, since this is a contract made in Iowa, between citizens of Iowa, to be performed in Iowa. [12 C. J. 451, sec. 34; 5 R. C. L. 931, sec. 25.] Respondent's evidence shows that neither he, McClain, nor Allen, made any promise to extend the time of payment of any of the notes for any period of time whatever. Respondent did have evidence to show that on March 3, 1921, Dillon Turney requested respondent not to foreclose and promised to pay the mortgage notes if he held off foreclosure; that is, that he would

pay a substantial amount on March 5th and the balance in a short time. Respondent did not testify that he promised to wait that long or to wait any time at all, but he did forbear from foreclosure until March 5th (when the payment was made) and for a long time thereafter. The court, to reach the verdict it did; must have found that this request and promise applied to the two notes owned by respondent and the Allen note. We are bound by that finding. ■

It is somewhat generally held, although there is substantial authority to the contrary, that "actual forbearance without a promise to forbear is sufficient, if such forbearance is at the request of the promisor and in reliance on his promise." [13 C. J. 348, sec. 200.] This is on the theory that acceptance may be by an act and that a unilateral contract, when completed by performance, becomes as binding as a bilateral contract. [See 74 A. L. R. 298, note; 19 L. R. A. (N. S.) 842, note; 13 C. J. 344-349, secs. 194-202; 8 C. J. 236-239, secs. 371-375; 28 C. J. 921-923, secs. 56-58; 6 R. C. L. 659, sec. 70; 3 R. C. L. 940, sec. 136.] The Iowa decisions seem to follow this rule. In Queal & Co. v. Peterson, 138 Iowa, 514, 116 N. W. 593, 19 L. R. A. (N. S.) 842, it is said: "If the creditor does in fact forbear from suing at the request of another, there is a good consideration for the guaranty of the indebtedness in connection with such request." This case is approved in two later Iowa cases, Green Bay Lbr. Co. v. Fredericksen, 197 Iowa, 70, 196 N. W. 790, and Blain v. Johnson, 201 Iowa, 961, 208 N. W. 273. We will, therefore, consider that there was a valid Iowa contract of assumption between Dillon Turney and respondent. We do not, however, decide the Missouri law upon that proposition. [See 1 Restatement of the Law of Contracts, A. L. I. pp. 61-65, secs. 55-58, p. 69, sec. 63, p. 110, sec. 90.]

We are convinced, however, that this action was barred at the time suit was commenced under our five-year Statute of Limitations. [Sec. 862, R. S. 1929.] Appellant and respondent argue the question of limitations under both Iowa and Missouri statutes and are in doubt as to which one applies. It does not seem to make any difference since Iowa likewise has a five-year statute as to unwritten contracts. [Sec. 11007, Subdivision 5, Chapter 487, Code of Iowa, 1927.] ■

The general rule is that the Statute of Limitations of the state in which the action is brought governs, except where the foreign statute which creates a cause of action provides the limitation. [State of Kansas ex rel. Winkle Terra Cotta Co. v. U. S. Fidelity & Guaranty Co., 328 Mo. 295, 40 S. W. (2d) 1015; 17 R. C. L. 698, sec. 49, p. 947, sec. 311; 37 C. J. 730, sec. 47; 12 C. J. 447, sec. 27, 485, sec. 92.] We have by statute, Section 869, Revised Statutes 1929, created another exception to this rule, that is, if an action is barred by the laws of the state in which it originated, that is a defense to it here. Therefore, if plaintiff's action was barred either in Iowa or by our statute

he cannot recover. It seems that plaintiff's action here is barred by both.

 The question which we think is most important in determining the applicability of the Statute of Limitations, here, is whether by the alleged assumption agreement between Dillon Turney (grantee) and respondent (mortgagee), Dillon Turney became the primary obligor for the mortgage debts. When an assumption agreement is made as a part of the purchase price, between the grantor and the grantee, it is held that as to the mortgage debt the grantee becomes the principal obligor and the grantor a surety. [41 C. J. 737, sec. 789, 19 R. C. L. 373, sec. 143.] It seems logical that the obligation of a principal should continue for the same period as does that of his surety. Two of our Courts of Appeals have so held. [Smith v. Davis, 90 Mo. App. 533; Fender v. Haseltine, 106 Mo. App. 28, 79 S. W. 1018.] Even in this situation, it has been held that the Statute of Limitations of contracts not in writing applies, although the assumption provision is written in their deed, on the theory that the grantee not having signed anything was not bound under a contract in writing. For these cases and also contrary authority see 51 A. L. R. 981, note, and 21 Am. & Eng. Ann. Cas. 679, note. But the agreement sued on here (the court having found no agreement to assume between the Turney brothers and there being no substantial evidence that as a part of the consideration of the transaction between them Dillon Turney agreed to assume and pay the mortgages) was one between the grantee and the mortgagee. There was no extension of time by which Ellsworth Turney could have been released to any extent at all. Furthermore, everything was done with his knowledge and consent. There was no agreement by which he, as grantor, became a surety only. If Dillon Turney became liable for the mortgage debt, his liability commenced only when he made an agreement with respondent to pay. That was alleged in the petition and shown by the evidence to be an oral promise made in March, 1921. This action was commenced in July, 1929. While Dillon Turney had sufficient interest in the land (if only to hold it as security for the money he advanced for his brother) to receive, from respondent's forbearance some personal benefit, yet Ellsworth Turney remained the principal obligor of the mortgage notes and his contract was collateral thereto.

"Where the mortgagee and grantee enter upon a subsequent independent collateral contract in which the grantee agrees to pay the mortgage indebtedness, the mortgagee has a right of action at law on the contract." [41 C. J. 752, sec. 820.] This action is *assumpsit*. [41 C. J. 751, sec. 918.] That is the nature of the contract here sued upon. Dillon Turney became liable to pay respondent the mortage debt by a contract not in writing, which was inde-

pendent of any deed or other written instrument, and we hold that (regardless of the Iowa law) our statute bars action upon it after five years.

 Respondent contends further that even though the five-year statute applies, his cause of action did not accrue until the agreement was repudiated or until a reasonable time (which would raise a question of fact) had elapsed in which to perform it. [37 C. J. 817, sec. 166.] This was the theory stated by the trial court in its conclusions of law. That rule does not apply to unconditional agreements to pay bills and notes past due or to become due at a specified time. If the payment of such debt, already due, is independently assumed, without any agreement for extension of time, the statute begins to run from the date of such a contract of assumption or guaranty. [37 C. J. 816, sec. 163, p. 838, sec. 190; In re Herbert & Co., 262 Fed. 682; Robertson v. Stuhmiller, 93 Iowa, 326, 61 N. W. 986.] Even where a note or obligation is payable on demand, the statute begins to run from its date. [8 C. J. 406, sec. 602; 3 R. C. L. 1220, sec. 441; 37 C. J. 818, sec. 168, p. 845, sec. 200; 17 R. C. L. 727, sec. 86, p. 769, sec. 136; St. Charles Savings Bank v. Thompson, 284 Mo. 72, 223 S. W. 734.] The agreement here as to respondent's notes then due was, at the most, a demand obligation. There was no extension of time or even a promise to forbear for a definite period. Respondent had the right to proceed when he saw fit to do so. The Allen note was due in less than one year, but subject to immediate foreclosure because of unpaid interest. Dillon Turney's obligation upon assuming it was, at most, to pay it at maturity. The statute commenced to run at that time. [Fender v. Haseltine, 106 Mo. App. 28, 79 S. W. 1018; 37 C. J. 816, sec. 163.] Respondent's action was therefore barred. Having reached this conclusion it is unnecessary to prolong this opinion with a discussion of whether the assumption agreement was within the Statute of Frauds. [See 1 Restatement of the Law of Contracts, A. L. I. 241-245, secs. 182-184.] The judgment is reversed. *Ferguson* and *Sturgis*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All of the judges concur, except *Hays*, *J.*, not voting, because not a member of the court when cause was submitted.

## ON MOTION FOR REHEARING

Respondent, in his motion for rehearing, contends that the opinion herein overlooked or misconstrued the evidence favorable to him, tending to show an agreement between the Turney brothers (as a part of the consideration for their transaction) that Dillon Turney assumed and agreed to pay the mortgages on the land. Because of

the manner in which the cases were tried below and submitted here it was necessary to set out, in the opinion for the purpose of deciding both cases, all the facts shown by the evidence favorable to both sides introduced in the equity case, which was tried first, and which also became a part of the evidence in the law case. The opinion recognizes that, in the law case, we are bound by the facts specifically or necessarily found by the trial court which are supported by substantial evidence. However, in view of the motion for rehearing, we have again carefully reviewed the entire record.

In McFarland v. Melson, 323 Mo. 977, 20 S. W. (2d) l. c. 68, this court, after reviewing evidence which it was claimed was sufficient to make a submissible case for the enforcement by the mortgagee of an oral agreement whereby a grantee of the mortgaged land was alleged to have assumed and agreed to pay the mortgage as a part of the purchase price to his grantor, said: ''It is our conclusion from the whole record that, measured by the standards which the law imposes in cases of this character . . . that there was no substantial evidence to support a judgment for appellant.'' It is our conclusion, in this case, that the evidence of an agreement between the grantor and grantee (Turney brothers) that Dillon Turney would assume and agree to pay all the mortgages on the land as a part of a purchase price for the farm is even weaker than the evidence of such an agreement in the McFarland case. There was evidence tending to show that an agreement was made by Dillon Turney with respondent, in consideration of forbearance from foreclosure, to pay his mortgages. Respondent must stand or fall on that agreement.

■ Respondent also contends that we have overlooked the point presented in his brief that after the evidence was heard defendant filed an amended answer; that this constituted an abandonment of the defenses in the original answer; that this amended answer contained neither a denial of an assumption agreement, before the conveyance of the land to defendant or a later agreement to pay the note, nor a plea of the Statute of Limitations of either Missouri or Iowa, except as to the first count of plaintiff's petition on which the court found for defendant; that the effect of this amended answer was to admit both the previously denied assumption agreement between the Turney brothers and the agreement with plaintiff to pay; and that it set up neither a denial nor limitations as a defense to the notes plaintiff owned. Respondent says, therefore, the grounds upon which this case was reversed had been abandoned as a defense. If defendant Dillon Turney abandoned his original answer and did not plead these defenses in his amended answer that would be true. [New First Natl. Bank v. C. L. Rhoades Produce Co., 332 Mo. 163, 58 S. W. (2d) 742, l. c. 744.] Did he do that?

It must be admitted that so far as our practice is concerned the so-called amended answer is an anomaly. It commences as follows:

"Comes now the defendant, Dillon Turney, after the close of the evidence and before the submission of the cause to the court, *and does move the court* in furtherance of justice *to permit this defendant to amend his answer* and thereby conform this pleading to the facts proved as follows."

It then states as to the note sued on in respondent's first count (the McClain note upon which the court found against respondent) that defendant denies that a parol assumption agreement was made between the Turney brothers; that if any was made it was made on February 28, 1921 (date of deed), and would be barred under Section 11007, subsection 5, chapter 487, Code of Iowa, 1927, and Section 317, Revised Statutes 1919; that defendant denies that a parol agreement was made between him (the grantee) and plaintiff (the mortgagee) to pay plaintiff if he would withhold foreclosure; that if any was made it was made not later than March 5, 1921, and would be barred by the same limitation provisions.

As to the notes sued on in the other counts it makes only general statements of which the following is typical:

"Defendant says as to the oral contract to assume the indebtedness evidenced by the note described in count four of plaintiff's petition and amended petition, the cause of action accrued thereon as to plaintiff on February 28, 1921, and plaintiff's right now to recover thereon is barred by the particular sections of the statutes of limitations referred to in division one of this amended answer and for the reasons therein set forth.

"And as to the oral agreement upon the part of defendant to pay the note described in count four of petition and amended petition, the cause of action accrued thereon as to plaintiff on March 6, 1922, and plaintiff's right now to recover thereon is barred by the particular sections of the statutes of limitations referred to in division one hereof, and for the reasons therein set forth."

Under the view we take it is not necessary to rule as to the sufficiency of this pleading. At the close of defendant's evidence, defendant, before filing this pleading, filed a motion to strike respondent's petition from the files on the ground that the evidence affirmatively and conclusively showed that neither an assumption agreement between the Turney brothers, nor an agreement to pay respondent or any other mortgage note holder, was made. (This was also a motion not according to our practice.) After this motion was overruled this so-called amended answer was filed. This pleading and its filing is shown in the bill of exceptions. There is no order shown either there or in the record proper granting the leave asked to amend. Plaintiff orally objected to its filing and this objection was overruled. Thereafter, plaintiff filed a demurrer to it which was overruled and then filed a reply, containing a general denial

and pleading another Iowa statute and Iowa decisions. Looking for an explanation of these maneuvers, since there were Iowa lawyers representing defendant (and plaintiff also), we find that under the Iowa practice, it is provided:

"All matters of supplement or amendment, whether of addition or subtraction, shall not be made by erasure or interlineation of the original, or by addition thereto, but *upon a separate paper, which shall be filed and constitute, with the original, but one pleading.* But if it be stated in such paper that it is a substitute for the former pleading intended to be amended, it shall be so taken, but the pleading superseded by the substitute shall not be withdrawn from the files." [Sec. 11184, p. 1409, chap. 491, Code of Iowa, 1927; same section, p. 1432; chap. 491, Code of Iowa, 1931.] Our practice is just the opposite. We do not allow one pleading to piece out another. Section 828, Revised Statutes 1929, requires:

"In every petition, answer or reply, amendatory or supplemental, the party shall set forth in one entire pleading all matters which, by the rules of pleading, may be set forth in such pleading, and which may be necessary to the proper determination of the action or defense."

However, regardless of what the Iowa law is, it is apparent that, while defendant was undertaking to add something to his answer by amendment in a way not authorized by our practice, he did not intend to abandon his denial that an assumption agreement was made with his brother or that an agreement was made with plaintiff, McClain and Allen to pay their notes. These issues, as to whether such agreements were made, were live ones throughout the trial. Respondent continued to treat them as still being issues, after defendant made this attempt to amend, by requesting the court to give declarations of law concerning them. This is also true concerning the defense of the Statute of Limitations. We hold that the attempted amendment of the answer, in this manner, was ineffective because it did not comply with our statutory requirements for making amendments and must be treated as a nullity.

Respondent makes the further contention, which he has not made before, that Dillon Turney was a resident of the State of Iowa at the time the cause of action accrued; that there is no evidence that he ever lived in Missouri; that there is no evidence that he could ever have been served with process in Missouri prior to the time he was served at the commencement of this action; and that the Missouri Statute of Limitations would not commence to run until he came into this State. The law in Missouri was as respondent contends, prior to 1845. [King v. Lane, 7 Mo. 241, 37 Am. Dec. 27; Tagart v. Indiana, 15 Mo. 209.] However, in the Revision of 1845, the section of the statute providing that the period of limitation did

not begin to run against persons who were absent from the State at the time the cause of action accrued was amended by adding the words "who is a resident of this State." This section is now Section 871, Revised Statutes 1929, the applicable part of which reads as follows:

"If at any time when any cause of action herein specified accrues against any person *who is a resident of this State,* and he is absent therefrom, such action may be commenced within the times herein respectively limited, after the return of such person into the State."

Ever since the Amendment of 1845 it has been held that when the defendant is not a resident of the State the statute runs from the time the cause of action accrues and if the plaintiff sees fit to sue him in Missouri, his action "can only be commenced within the periods prescribed in the following sections after the cause of action shall have accrued" (Secs. 860, 861, 862, 863 and 864, R. S. 1929), whether the defendant has been in Missouri one day or for the full period prescribed in those sections. [Thomas v. Black, 22 Mo. 330; Scroggs v. Daugherty, 53 Mo. 497; Fike v. Clark, 55 Mo. 105; Orr v. Wilmarth, 95 Mo. 212, 8 S. W. 258; St. Joseph & Grand Island Ry. Co. v. Elwood Grain Co., 199 Mo. App. 432, 203 S. W. 680; Kissane v. Brewer, 208 Mo. App. 244, 232 S. W. 1106; Koppel v. Rowland, 319 Mo. 602, 4 S. W. (2d) 816.] Respondent's action was, therefore barred by our five-year statute.

Respondent's motion for rehearing is overruled.

PER CURIAM:—The foregoing opinion by Hyde, C., is adopted as the opinion of the court. All of the judges concur.

