250 S.W.2d 989 (1952)
BASMAN
v.
FRANK et al.
No. 42656.
Supreme Court of Missouri, Division No. 1.
July 14, 1952.
Motion for Rehearing or to Transfer to Denied September 8, 1952.
*990 C. Arthur Anderson, St. Louis, John A. Eigel, St. Louis, Gragg & Aubuchon, St. Louis, O. P. Owen, St. Louis, for appellants.
Harry Gershenson, St. Louis, Tralles, Hoffmeister & Gilpin, St. Louis, for respondent.
Motion for Rehearing or to Transfer to Court en Banc Denied September 8, 1952.
HYDE, Presiding Judge.
Action in equity to set aside two deeds to real estate in the City of St. Louis. The *991 Court entered a decree cancelling both deeds and defendants have appealed.
The real question raised on this appeal is the sufficiency of the evidence to support the decree. The petition alleged that plaintiff was aged and infirm and was living with defendants Franks; and that he executed a deed to them without consideration because of his complete faith and confidence in them, and also turned over his money ($6,000) to them. The petition further alleged that the Franks fraudulently conveyed to defendants Pungs (their daughter and son-in-law) to hinder and deprive plaintiff of the property.
Plaintiff's wife died in February 1945, when he was 68 years of age. Plaintiff was in poor health and went to the hospital for an operation in August 1945. When he got out of the hospital in September, Mr. Frank, who had known him many years suggested he stay at his home and he went there. The Franks had two boys who were then away in war service. Plaintiff turned over $6,000 to Mr. Frank to keep for him and Frank put half of it in the Lemay Bank and half in the Cass Bank in his own accounts. Frank also had an account in the Southern Commercial Bank, but said this was money for which he was trustee for his son, and he had money of his own in the Cass Federal Savings and Loan Company at 2½ interest. During 1946, plaintiff was in the hospital three times, (January, June and July, and November and December) for treatment and operations. On February 3, 1947, he conveyed his real estate to the Franks. It was a four family brick building which brought in a total monthly rental of $83.50. Frank took him to his attorney who made the deed and plaintiff was not represented by anyone. They went together that same day and had the deed recorded. No consideration was paid on that day and Frank never had an examination of the title made. However, Frank claimed that he paid plaintiff $6,500 in currency at home on the next day but there was no explanation or record of what plaintiff could have done with that amount of money. Plaintiff was in the hospital again during June and July of 1947. In January 1948, the Franks gave plaintiff two weeks notice to leave. They said plaintiff "got crabby" and was difficult to take care of. Plaintiff wanted his money and Frank gave him a $4,000 cashier's check on the Southern Commercial Bank on January 19, 1948. Frank claimed that he had paid $350 on plaintiff's wife's funeral bill and $132 for her grave stone and had given plaintiff small amounts for spending money. Frank kept the rest of the money (about $1,500) for board. He figured that was about eleven dollars per week. He said there had never been any agreement about the amount of board. Four days after Frank paid plaintiff this $4,000 (on January 23, 1948) he conveyed to the Pungs the property plaintiff had deeded to him in 1947. The Pungs executed notes secured by a deed of trust for $4,000 and claimed they paid Frank $3,000 in cash.
The notes and deeds were prepared by a real estate company. However, no cash was paid there. Frank said he took notes from the Pungs in order to have a record because of the trouble with plaintiff. Frank said that plaintiff had "talked around to the neighbors and people that I cheated him out of that six thousand dollars", also claiming "we cheated him out of the money and the house."
Plaintiff's daughter, Mrs. Tettambel, testified that she and her husband originally owned the property with plaintiff. They bought it in 1923 for $9,000 and put in bath and furnace afterward. She said it was kept in good condition. Pung testified that it was worth $12,500. Plaintiff and his two daughters had not been on good terms since their mother died. There was evidence that plaintiff was very careful in his business affairs and always gave receipts for money paid to him. He was also thrifty and very close with his money. Plaintiff employed attorneys early in 1948 (he was in the hospital from August to October 1948) to recover his money and property and for a complete accounting. After their investigations and conversation with the Franks, plaintiff urged them to file suit, which they did December 18, 1948. However, plaintiff disappeared in November 1948 and had not been located at the time of the trial in March 1950. The attorney for his two daughters assisted the attorneys employed by plaintiff at the trial.
*992 Admissions from the depositions of the Franks and the Pungs were offered as a part of plaintiff's case. Frank and Pung also testified at the trial but their wives did not. The Court found that the $6,000 had been repaid by Frank to plaintiff, in cash, board, and other items, but did not believe the testimony concerning the cash transactions on the property. The details of these were as follows: Frank said he paid plaintiff $6,500 in currency when he was keeping $6,000 of plaintiff's money in his bank accounts. He said he had $2,500 of this around the house in crocks and that he borrowed $4,000 in currency from Herman Neider who was a friend of his sons. He gave no note or receipt of any kind to Neider and claims he paid him back a year and a half later with interest at four per cent. Frank was operating a one chair barber shop and owned no real estate. He rented his home, paying $25 per month. He estimated he made $60 to $70 per week and paid $12 per month rent for his barber chair space in the back of a saloon. In October 1945, he received $800 for a leg injury sustained while working at the Griesdeieck Brewery in 1944, and this was deposited in his account at the Cass Bank. He also sold a lot he owned in Jennings Heights for $1,710 and this was deposited (with other money making a total of $1,900) in the Lemay Bank in November 1945. He had been in the tavern business previously and had sold out in 1942 for $750. Mr. Neider had been a machinist at Anheuser-Busch at $1.50 per hour prior to 1946. He owned his home but had a mortgage of $1,600 on it. After 1946, he was in the hauling business, hauling lumber, and also doing grading and plowing. He owned a 1½ ton 1946 Dodge truck and bought and hauled lumber mainly from Arkansas. It was a one man business and he had no regular helper. He had a savings account at the Lemay Bank (which varied from $1,000 to $3,000) but said he had the $4,000 in a box in his chifforobe at home. He could not estimate his income for 1946 or 1947, but said he took in around $1,500 or $2,000 from grading work in 1946. Most of the lumber hauling was done in the spring and summer. He averaged about two trips a week for six or seven months a year.
He "tried to average twenty dollars a thousand" and when he hauled three thousand "would average sixty dollars", but paid his expenses out of that, including a helper at one dollar per hour during the trip. At the time of the trial he was working in a die shop on a salary because the hauling business was not paying off then. His practice was to get receipts on the lumber he bought (between $800 and $1,000 per load) and gave receipts on his grading work. He used his bank account to pay for lumber he bought and hauled. He said he had loaned $1,500 to one man from whom he took a receipt but had loaned a smaller amount to another without taking a receipt. He did not ask Frank for a note, mortgage or receipt. Other facts will be mentioned later in the opinion.
Section 510.310 subd. 4 RSMo 1949, V.A.M.S. provides "in cases tried upon the facts without a jury" that "the judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Therefore, if plaintiff made a prima facie case, the findings of the trial court, based on the credibility of the witnesses who testified before him, rejecting defendant's explanation, must be given great weight and should not be set aside unless the proof adduced is palpably insufficient to sustain them or unless the evidence is overwhelmingly against them. See McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698 and cases cited. In this case, the Court made detailed specific findings of fact including findings that defendants Franks caused plaintiff to execute the deed to them in 1947 without consideration and that said transfer was not a gift; that defendants had the deed prepared by their attorney and that plaintiff had no independent advice or counsel from anyone; that defendants did not borrow $4,000 from Neider and at the time had on deposit in banks funds in excess of that amount; that plaintiff made transfer of the real property to defendants "under the same conditions as the transfer to them by plaintiff of the $6,000.00 in cash, namely, to be transferred back to plaintiff upon request"; that the *993 defendants Pungs "are in truth and in fact straw parties" and actually paid no consideration for the real property and have no interest in it; and "that the deed of trust and notes thereby secured represent no consideration and were placed thereon by said defendants and each of them for the purpose of hindering and defrauding plaintiff of his right in and to said real property."
The principles applicable to this case are stated in the American Law Institute Restatement of Restitution, Sec. 182, as follows: "Where the owner of an interest in land transfers it inter vivos to another upon an oral trust in favor of the transferor or upon an oral agreement to reconvey the land to the transferor, and the trust or agreement is unenforceable because of the Statute of Frauds, and the transferee refuses to perform the trust or agreement, he holds the interest upon a constructive trust for the transferor, if
"(a) the transfer was procured by fraud, misrepresentation, duress, undue influence or mistake of such a character that the transferor is entitled to restitution, or
"(b) the transferee at the time of the transfer was in a confidential relation to the transferor, or
"(c) the transfer was made as security for an indebtedness of the transferor."
The comment under this section is in part, as follows: "Where the owner of an interest in land transfers it to another who orally agrees to hold it in trust for the transferor or to reconvey it to the transferor, and the transferee at the time of the transfer was in a confidential relation to the transferor, the transferee will not be permitted to keep the land but will be compelled to hold it upon a constructive trust for the transferor, since otherwise he would be unjustly enriched. * * * A confidential relation exists not only where there is a fiduciary relation such as that between attorney and client, trustee and beneficiary, guardian and ward, partner and partner, and the like, but also where, because of family relationship or otherwise, the transferor is in fact accustomed to be guided by the judgment or advice of the transferee or is justified in placing confidence in the belief that the transferee will act in the interest of the transferor." See also Sec. 166 Restitution and comment on confidential relation, pages 676-677; Peacock v. Nelson, 50 Mo. 256; Thierry v. Thierry, 298 Mo. 25, 249 S.W. 946; Italiani v. Higbee Coal Mining Co., 331 Mo. 362, 53 S.W.2d 1050; Thieman v. Thieman, Mo.Sup., 218 S.W.2d 580; Wagner v. Hicken, Mo.Sup., 232 S.W.2d 531.
Certainly there was a confidential relation here between Frank and plaintiff. Frank not only provided a home for plaintiff apparently making him feel that he would be treated and cared for like a member of the family, but also took charge of all of his money, giving him only small amounts therefrom from time to time for spending money. There was never any accounting for the money and apparently plaintiff had such confidence in Frank that he never asked for one while he was living there. Plaintiff went from the hospital to Frank's home after a serious operation and was in the hospital again on three separate occasions (two of them for more than a month) during the next year before the deed was made. Obviously, plaintiff was not able to look after his rental property himself. Plaintiff trusted Frank and executed the deed to him (just as he had turned over his money to him) prepared by Frank's own lawyer without seeking any independent advice from anyone. This left plaintiff completely dependent upon Frank for the custody, control and management of everything he owned. Frank had plaintiff's money in his own bank accounts and plaintiff's real estate in his own name on the deed records. Defendants contend that the mere opportunity to unduly influence, unsupported by other evidence showing its actual existence, does not raise a presumption of undue influence even though a confidential relationship is shown, citing Lastofka v. Lastofka, 339 Mo. 770, 99 S.W.2d 46 and Hahn v. Brueseke, 348 Mo. 708, 155 S.W.2d 98. However, those were cases in which the transaction sought to be set aside was intended to be a gift. There is no such claim here. The issue here is not undue influence *994 but whether there was a valid sale to defendants, or whether there was a transfer intended for the transferor's own benefit, induced by fraud, misrepresentation or because of a confidential relationship, requiring the finding of a constructive trust. We recognize the rule stated by defendants, that evidence to justify setting aside a deed must be clear, cogent and convincing. However, our conclusion is that plaintiff sustained this burden by showing facts and circumstances from which the most reasonable inference was, the conveyance of plaintiff's land was on the same conditions as transfer of his money; and that the Court was warranted in refusing to believe defendants' explanation of the transaction as a sale. We, therefore, hold that it was proper for the Court to declare a constructive trust for the benefit of plaintiff.
We also think the evidence sustains the findings of the Court that the conveyance from the Franks to the Pungs was without consideration and for a fraudulent purpose. This deed was made only a few days after Frank had given plaintiff notice to leave his home and after plaintiff had been (to Frank's knowledge) telling the neighbors that Frank had cheated him out of his money and property. It was made only four days after Frank had found it necessary to give back to plaintiff $4,000 of his money. The claimed consideration was not much more than half of the value of the property as admitted by Pung. The claimed cash transactions, all but the last one without any written evidence by a check, note or receipt, were a very unusual method of doing such business, especially for persons with considerable amounts in bank accounts. It is significant, as to the conveyance between Frank and Pung, that Frank said he made such a complete documentary record on it because of the trouble which plaintiff had started and after plaintiff had said "I am going to fix you." (Frank said: "So, I figured I better get everything straightened out and have proof.") Moreover, Pung admitted that he had never been inside the building before he claimed to have bought it and had only been in it twice since, and then only to make repairs at the request of Frank. Pung was a carpenter and builder and had bought and sold places. He owned mortgages on two places he had sold. He did not have this title examined but did have the title examined on his own place before he bought it. (Frank did not have any title examination when he got it.) Pung's brother was a lawyer and real estate man but he did not consult him about the transaction. Furthermore, Frank has continued to look after the property, collecting the rents, signing the receipts for the tenants, and paying for taxes, insurance and repairs. "Fraud, like any other fact, may be established by circumstantial evidence. There are circumstances which have come to be recognized as indicia or badges of fraud, one of which circumstances alone may not prove fraud, but may warrant an inference of fraud, especially where there is a concurrence of several indicia of fraud". Bank of New Cambria v. Briggs, Mo.Sup., 236 S.W.2d 289, 291, and cases cited; Castorina v. Herrmann, 340 Mo. 1026, 104 S.W.2d 297; Hendrix v. Goldman, Mo.Sup., 92 S.W.2d 733. We hold that there were sufficient badges of fraud on this transaction to support the finding and decree setting it aside.
It is further contended that the lawyers employed by plaintiff had no authority to maintain and try this case. It is true that, where a party to an action dies, the authority of his attorney is terminated, and authority to proceed further must be obtained by employment by the deceased's personal representative. See Carter v. Burns, 332 Mo. 1128, 61 S.W.2d 933 and authorities cited. However, there is no proof in this case that plaintiff is dead. "The law presumes that a person shown to be alive at a given time remains alive until the contrary is shown by some sufficient proof, or, in the absence of such proof, until a different presumption arises." 16 Am.Jur. 16, Sec. 12; 20 Am.Jur. 212, Sec. 213; Tillotson v. Travelers' Ins. Co., 304 Mo. 487, 263 S.W. 819, 823. In the Tillotson case we said, concerning the missing insured therein, "he is presumed to be still alive, and there is no legal presumption of his death merely from lapse of time prior to the expiration of said seven years." Sections 466.100 and 490.620 RSMo 1949, V.A.M.S. establish a presumption of death upon absence *995 for seven consecutive years but no administration is authorized short of this time without some showing of date or place of death. (See Sections 461.230-461.250 RSMo 1949, V.A.M.S.; see also Annotation 64 A.L.R. 1298; Ferril v. Kansas City Life Ins. Co., 345 Mo. 777, 137 S.W.2d 577. It was shown that plaintiff herein employed the lawyers who brought this action and urged them to commence suit. Nothing that would revoke their authority appears in this record.
The judgment is affirmed.
All concur.