KATE GRANDGENETT, RESPONDENT, v. NATIONAL PROTECTIVE INSURANCE ASSN., APPELLANT.—73 S. W. (2d) 341.

Kansas City Court of Appeals. June 11, 1934.

*James A. Reed, James E. Taylor, James H. Hanley* and *Burr S. Stottle* for respondent.

*Mosman, Rogers & Buzard, P. H. Jackson* and *Louis N. Wolf* for appellant.

CAMPBELL, C.—The defendant in December, 1928, issued to N. C. Grandgenett a policy of accident insurance in which plaintiff, wife of the insured, was the named beneficiary. The policy provided that defendant would pay to plaintiff the sum of $1200 in event the death of insured resulted solely from bodily injuries effected, directly and independently of all other causes, through external, violent and accidental means by the wrecking or disablement of any privately owned automobile of the pleasure car type in which the insured was riding or driving or by being actually thrown from within such wrecked or disabled automobile. In the nighttime on April 13, 1929, insured disappeared. The plaintiff notified the defendant that her husband had disappeared; that she claimed he was dead, and that she was entitled to receive the benefit provided in the policy. The defendant denied liability upon grounds which we will hereinafter state. Plaintiff in January, 1931, brought this suit to recover the sum of $1200, penalties and attorneys' fees. She obtained a judgment as prayed. The defendant has appealed.

The sufficiency of the petition to support the judgment is not questioned. The answer was a verified general denial.

The defendant insists that the court erred in refusing to give its requested instruction in the nature of a demurrer to the evidence.

It was incumbent upon plaintiff to produce substantial evidence tending to show (1) that the insured was dead; (2) that his death resulted solely from bodily injuries effected, directly and independently of all other causes, through external, violent and accidental means, and (3) by the wrecking or disablement of an automobile in which he was riding.

On April 6, 1929, insured, his wife and their youngest child, Nellie, lived in River Sioux, Iowa. On the day last named the insured went to Pender, Nebraska, at which place three of his children resided. On Saturday, April 13, 1929, about 7:15 o'clock P. M., the insured and Hother Headley, husband of insured's daughter Josephine, left Pender in a model T Ford automobile, intending to go to a "fish camp" located on the Missouri River, about twenty-eight miles distant. They were next seen about ten or eleven o'clock that night at the home of Herbert V. Birk, one-fourth mile west of the river. Mr. Birk was personally acquainted with the occupants of the automobile, talked with them a few minutes, and gave them information concerning the way to the camp. The insured and his son-in-law left the

Birk home, drove east toward the river upon an unplowed strip of land, and Mr. Birk watched them until they were about "half way" to the river. Neither insured nor his son-in-law were again seen or heard from. On Sunday, April 14, Maurice Grandgenett, the insured's son, evidently became alarmed because his father and brother-in-law had not returned to Pender. On the night of that day he went to the Birk home and to the camp and inquired concerning the missing ones. He returned to the Birk home on Monday morning, and at this time in company with Mr. Birk, followed the tracks of the automobile from the Birk home to the river. The tracks were undoubtedly made by the automobile in which the insured and his son-in-law were riding on the night of April 13. On the next day the sheriff and county attorney went to the scene, procured the aid of others and removed the automobile from the river.

The sheriff testified that after he removed the automobile from the river he made an investigation as to who owned it and found that it belonged to the insured's son-in-law.

"Q. Now, Mr. Jensen, will you describe as near as you can the condition of the ground on the bank of the river as well as the bank itself? Its proximity to the surface of the water as you observed it on the 15th of April, 1929, when you were down there. A. The nature of the ground is what we call 'wild hay land.' There was a drop of about fourteen, twelve or fourteen feet from the level of the road to the edge of the water.

"Q. Did you observe the road for automobile tracks, or otherwise at that time? A. Yes.

"Q. Tell what you saw as to that? A. There were two tracks leading right up and to a point at the edge of the bank. It had the appearance of an automobile tire skidding along. Just at the edge of the bank where it went over, the drop is almost straight down the bank and—

"Q. Would you call that perpendicular? A. Almost. . . .

"Q. Did you determine at that time how deep the water was? A. Yes, sir.

"Q. State as to that. A. Eight or ten feet.

"Q. Could you see the car in the water? A. No. . . .

"Q. You did say the car was about three or four feet below the surface of the water? A. Something like that.

"Q. Anybody in the car? A. No.

"Q. Notice anything on the car—license plates, or anything else? A. Yes, there were license plates on the car.

"Q. Did you notice the condition of the car after you had pulled it out of the river? A. The windshield had been broken out—the canvas or cover on the top had been pulled off— . . .

"Q. Did you observe the channel of the river—the flow of the water at that time? A. Yes.

"Q. State what you observed with reference to the channel of the river? A. The channel was running pretty well up to the bank."

Mr. Birk testified that on Monday, April 15, in company with insured's son, Maurice, he followed the tracks of the automobile in which he saw insured and Headley on the night of April 13, from his home to the river bank; "that the tracks led right to the edge of the bank. There was some dirt caved off and there was a piece of three cornered glass lying down—good sized like, next to the water; . . ." that at this point the distance from the bank of the river to the edge of the water "up and down" was nineteen feet; that the automobile settled in water ten to twelve feet deep; that the automobile which the sheriff recovered from the river was the one in which insured and Headley were riding on the night of April 13; that he examined it, found that "the ignition key was turned on and the headlight switch turned on and the emergency brake was forward in high gear;" that the top of the automobile was "all mashed up, doors were sprung, one was mashed, door and glass was knocked out and the windshield was broken;" that there were no bodies in the automobile; that the current of the river at the place in question was "rather swift;" that the river was dynamited and dragged, but without result.

Mr. Crum testified in deposition that on the night of April 13, about eleven o'clock, when he was two or two and one-half miles southwest of the Birk premises, he saw lights, which moved east from said premises at a speed of thirty-five to forty miles an hour, suddenly disappear.

Mr. Boughn, county attorney, testified that he followed the tracks of the automobile from the Birk home to the river; that the tracks came "right up to the edge, . . . extended right up to the bank and the dirt was caved off where the track reached the verge of the bank."

The defendant invokes the rule that an inference cannot be built upon an inference and argues that there was no evidence either direct or circumstantial tending to prove any one of the three essential elements of plaintiff's case.

Were the evidence direct and circumstantial and the reasonable inferences to be drawn therefrom sufficient to show that the insured died on April 13, 1929, that his death was caused by the automobile running into the river, then it follows that the evidence was sufficient to warrant the jury in also finding that the death was accidental, violent, and caused by the wrecking of the automobile.

There was evidence tending to prove that insured and his son-in-law travelled from Pender to the home of Mr. Birk; that they sought

direction from the latter concerning the road to the camp; that they left the Birk home, travelled east and when last seen were one-eighth of a mile from the river bank; that the automobile tracks were plainly visible from the Birk home to the place where the automobile plunged over the bank of the river, a bank which "up and down" was nineteen feet, and came to rest in a swift current ten or more feet deep; that the tracks of the automobile leading to the edge of the bank "had the appearance of an automobile tire skidding along;" that the automobile was wrecked, the cover of its top "had been pulled off," was "all mashed up, . . . door and glass was knocked out and the windshield was broken;" that both the ignition key and the headlight switch were turned on and the emergency brake "was forward in high gear."

The direct evidence shows that insured and his son-in-law were last seen when they were one-eighth of a mile from and travelling toward the river in the automobile. From this fact alone the jury was warranted in finding that insured and his son-in-law were in the automobile at the time it plunged into the river. [Lynch v. Railroad, 208 Mo. 1, 19, 20, 106 S. W. 68, 78.] The direct evidence shows that the automobile at the time it plunged into the river was being operated on its own power because the lights were on, the ignition was on, and it was in high gear; that it appeared to skid when near the bank; that it settled in a swift current ten or more feet deep; that the automobile was wrecked to such an extent that the body of a man could have been removed from it by action of the current; that the occupants of the automobile were never seen or heard from thereafter. These facts, when considered in connection with the fact that when the automobile plunged over the bank and into the swift current, insured was confronted with a grave and imminent peril; a peril so great that the jury could find that his disappearance was "inconsistent with the continuation of life." [Bergman v. K. O. T. M., 203 Mo. App. 685, 697.]

The record undoubtedly shows that the insured and his son-in-law attempted to deceive or that they died in the Missouri river. In determining whether or not insured was guilty of an intentional wrong or whether death came to him, the jury could take into consideration the following facts: Insured was sixty-seven years old. He had lived, so far as this record shows, a blameless life. He married plaintiff in 1891. Six children were born to them. One of his children, Josephine, married Hother Headley, who also disappeared. Headley and his wife had three children, the grandchildren of insured. There was no discord in the home of insured nor in the home of his son-in-law. If the insured voluntarily disappeared he deserted the wife of his youth, his six children, his three grandchildren, and caused or suffered Headley to desert Josephine and insured's three

grandchildren. These facts considered with the other facts to which we have alluded, undoubtedly warranted the jury in finding that insured died; that his death was accidental and violent and caused by the wrecking of an automobile.

The writer of this opinion has read the "disappearance" cases cited in the briefs. Each of said cases was decided on its own peculiar facts. In none of them were the facts similar to the facts in the instant case. The defendant says that the material facts in this case are identical with those in the case of Tillotson v. Travelers Insurance Co., 304 Mo. 487. In that case the plaintiff alleged that the death of the insured was caused accidentally "by drowning in the Missouri river." The court said that all of the evidence was circumstantial. "While learned counsel for respondent claimed generally that he (Tillotson) may have fallen into the river and been accidentally drowned, they do not point out any circumstance in the record tending to prove it. . . . All the indications of a murderous attack and struggle are seemingly missing. On the other hand, there is much in the circumstances to show that Tillotson may have voluntarily disappeared. A most thorough search was made for his body, and it could not be found. There was evidence that he had a suit of clothes at the cleaners, when he left the Gates home, which he said he was going to get, and which he did get, between noon and three o'clock in the afternoon of the day of his disappearance." There was no direct evidence tending to show accidental death, and the circumstantial evidence tended to show that Tillotson voluntarily disappeared. In the instant case a careful reading of the record fails to disclose *any fact or circumstance* which would tend to show that the insured voluntarily disappeared.

The defendant criticizes that part of plaintiff's instruction No. 2, which told the jury that in arriving at its verdict it was entitled to take into consideration all of the facts and circumstances in evidence surrounding the disappearance of the insured and the reasonable and probable inferences arising therefrom. The facts and circumstances in evidence were such that presumption did arise from them and it was proper for the court to tell the jury that in arriving at its verdict it could consider the presumptions which were reasonable. [Wheeler v. Bowles, 163 Mo. 398, 408.]

Plaintiff's instruction No. 7, which the defendant says was erroneous, told the jury that the burden of proof was upon plaintiff to prove that her husband died on April 13, 1929, and that his death resulted "solely from bodily injuries effected directly and independently from all other causes through external, violent and accidental means." The criticism of the instruction is that it relieved the plaintiff of the burden of establishing one of the essential elements of her case, in that it did not say that the burden was upon plaintiff to

prove that death was sustained by the wrecking or disablement of an automobile. The instruction did not authorize a verdict. The failure to include the element of plaintiff's case, of which the defendant complains was nondirection, which was not error. [Moore v. Railroad, 136 Mo. App. 210; Sallee v. St. Louis-San Francisco Ry. Co., 321 Mo. 798.]

The defendant insists that there was no evidence tending to show that the refusal to pay was vexatious. The refusal to pay was not vexatious unless the facts brought to the attention of the defendant prior to the institution of this action were sufficient to induce a belief in a reasonable mind that plaintiff, under the terms of the policy, was entitled to receive the benefit therein provided.

Under date of April 16, 1929, plaintiff wrote to the defendant saying that on last Saturday her husband "went with another fellow over to the Missouri river to buy some fish. And by accident ran into the Missouri river north of Macy, Nebraska. We found the car in the river but they were washed out. . . ."

On April 23, the defendant forwarded proof blanks to plaintiff and requested the following: (1) Copy of the death certificate; (2) newspaper clippings; (3) if there was a coronor's inquest a transcript of the testimony and the findings of the jury; (4) short statements prepared by each of the witnesses to this occurrence. The plaintiff signed one of the proof blanks and in stating the details of the accident said: "Bank gave way and mist over river as far as we know was the cause." She further stated that the automobile was taken by sheriff Jensen; that it was "completely wrecked beyond driving." Her statements in the proofs, however, show that she had no personal knowledge concerning the accident. Dr. Lohman signed one of the claim blanks in which he said that death was due to drowning; that the body was not recovered; that the "car went over the bank into the Missouri river." He did not claim to have any personal knowledge of the matter. These blanks, together with several newspaper clippings, each of which gave an account of the accident, were forwarded to the defendant. On May 10, plaintiff again wrote to the defendant concerning her claim, to which inquiry the defendant on May 13, replied as follows:

"We received your May 10th letter and have received the newspaper clippings and your statement.

"You have presented no evidence to us of your husband's death and certainly no evidence of any accidental death from causes covered by the terms of the policy.

"Until such evidence is furnished the claim can have no further consideration."

On April 7, 1930, Mr. Hanley, attorney for plaintiff, wrote to the defendant as follows:

"Mrs. Kate Grandgenett of Pender, Nebraska, whose husband N. C. Grandgenett lost his life when the automobile in which he was riding capsized or went over the Missouri river vank near Decatur, Nebraska, on or about April 13, 1929, has referred her claim under the above policy to me for attention.

"She advised me that proof of the death has been forwarded to your office and directs me to bring suit on the policy, but before bringing any court action, I will wait a reasonable time to hear from you as to whether or not there is anything lacking in the proof of the death of N. C. Grandgenett, the insured."

The defendant replied on April 8, 1930, restating the letter which it wrote to plaintiff under date of May 13, 1929.

On April 29, 1930, Mr. Hanley wrote to the defendant as follows:

"Complying with your letter of the 8th inst., I herewith submit in support of the above claim the following evidence:

"1. Affidavit from Iler C. Jensen who was sheriff of Thurston County, Nebraska, on the 13th day of April, 1929, at the time of the accident which resulted in the death of N. C. Grandgenett, and his son-in-law, Hother Headley.

"2. The sworn statement of Herbert V. Birk who last saw the said N. C. Grandgenette before his automobile capsized in the Missouri river.

"3. Copy of statement made by Charles S. Locknane, inspector for the Modern Woodmen of America.

"4. Photograph of the automobile being taken from the Missouri river three days after the wreck.

"5. View of the bank over which the machine plunged.

"This evidence and photographs, we contend prove conclusively that N. C. Grandgenett lost his life when the car went over the embankment and to the bottom of the Missouri river. Their bodies were never found and neither one or the other ever appeared again.

"The Modern Woodmen of America paid a policy to the widow and I trust that under subdivision A of Part II of the policy that the widow is entitled to the $1200 as provided in Part I."

The defendant replied on May 2 as follows:

"Your letter to the National Protective Insurance Association dated April 29th has been received together with enclosures described in your letter.

"The policy Mr. Grandgenett had with the Association was a special coverage policy providing liabilities only in the event of certain described accidents.

"Nowhere in the proofs submitted is there any proof that there has been a death and certainly no proof of any death occurring in a manner described by the provisions of this policy.

140

"Until such proof is furnished nothing further can be done by the association in connection with this matter."

On May 6 the defendant again wrote to Mr. Hanley as follows:

"Your May 5th letter has been received. You state that you furnished all the testimony and evidence you can furnish and that you will be glad to submit it to any court and that you have been instructed to start suit on the policy.

"This contract is a Missouri contract and the laws of Missouri determine the liability, if any.

"There has been no proof whatsoever that this man is dead much less that his death was caused under conditions constituting liability under the policy. Under Missouri law death is not presumed and it cannot be shown by circumstance and even if it could it would be necessary to show that his death resulted by the means and under the conditions of the policy.

"Until the association has received proof of this man's death and proof that the death resulted within the terms of the policy the claim must be declined and if you desire to bring your lawsuit we will defend it."

In the letters written by the defendant it stated that the plaintiff had not furnished proof which entitled her to receive the benefit provided in the policy for the reason that she had not shown death "much less that his death was caused under conditions constituting liability under the policy."

The respondent says that "the testimony given at the trial was practically the same as had been furnished to defendant before the suit was brought." We do not find that this statement is supported by the record.

Though the newspaper clippings are set forth in the printed abstracts, the record *affirmatively shows that none of them were read to the jury.* None of the affidavits or statements mentioned in Mr. Hanley's letter of April 29 were introduced in evidence. The only evidence which the jury heard concerning the information furnished to the defendant prior to the institution of this suit was the photographs of the automobile, the statements in the proof signed by plaintiff and Dr. Lohman and the letters which were written by plaintiff and her attorney. The jury did not know the contents of any of the writings sent to the defendant by Mr. Hanley or the statements in the newspaper clippings and, hence, did not hear any evidence upon which to base a finding that the refusal to pay was vexatious. It may be that if the several writings and the newspaper clippings had been introduced in evidence they would have been sufficient to allow the jury to award penalties and attorney's fees; but in the absence of these things the jury did not hear evidence sufficient to show that the refusal to pay was vexatious. From which it follows

that on the record before us plaintiff was not entitled to have the question of vexatious refusal submitted to the jury.

If the plaintiff will, within fifteen days, remit the damages in the sum of $120, and the attorney's fee in the sum of $500, the judgment will be affirmed in the sum of $1398 as of the date of the verdict, otherwise, the judgment will be reversed and the cause remanded. *Reynolds, C.,* concurs.

PER CURIAM:—The foregoing opinion of CAMPBELL, C., is adopted as the opinion of the court. If the plaintiff will, within fifteen days, remit the damages in the sum of $120 and the attorney's fee in the sum of $500, the judgment will be affirmed in the sum of $1398 as of the date of the verdict, otherwise, the judgment will be reversed and the cause remanded. All concur.