MARY SPRINGMEYER, Respondent, v. SOVEREIGN CAMP WOODMEN OF THE WORLD, Appellant.

St. Louis Court of Appeals, February 6, 1912.

1. DEATH: Life Insurance: Evidence: Proof of Death: Burden of Proof. In an action on a life insurance policy, where there is no direct and positive proof that insured is dead and no room for the presumption of death from seven years' unexplained absence, the presumption is, that insured is alive, and the burden to prove the contrary rests on the plaintiff.

2. ———: ———: ———: ———: Modes of Proof. In the absence of direct or positive proof, the fact of death may be established by proof that the person whose death is in issue was, at last accounts, in a position of particular peril, as, for example, that he was dangerously ill, or was exposed to great peril of disease or accident, or even that he was near a river, despondent and threatening to kill himself; or by proof that his character, habits, condition, affections, attachments, etc., were such as to render his absence from home and family for any cause, other than death, improbable.

3. ———: ———: ———: ———: Question for Jury, When. In an action on a life insurance policy, where plaintiff seeks to show the death of insured by proving that he had been absent from home and family, unheard of, for over two years, and that his character, habits, condition, affections, attachments, etc., were such as to render his absence for any cause, other than death, improbable, in order to justify a refusal to submit the question of death to the jury, the insufficiency of the showing made to create the necessary improbability of life's continuance must be so apparent that reasonable minds would not differ concerning it; and when the evidence is such that the question becomes dependent upon shades of character and condition, degrees of affection or strength of attachment, or of the comparative controlling influences of different affections or attachments, and reasonable minds could well differ as to absence without death being probable, under the circumstances disclosed, the question should be submitted to the jury.

4. TRIAL PRACTICE: Insufficiency of Evidence: Directing Verdict. In order to warrant a direction of a verdict because of the insufficiency of the evidence to warrant a recovery, the evidence must be so deficient that reasonable minds would agree that it is insufficient.

5. DEATH: Life Insurance: Proof of Death: Sufficiency of Evidence. In an action on a life insurance policy where there was no direct and positive proof of the death of insured, but plaintiff sought to show his death by proving that he had been absent from home and family, unheard of, for over two years, and that his character, habits, condition, affections, attachments, etc., were such as to render his absence for any cause, other than death, improbable, evidence *held* sufficient to warrant a recovery by plaintiff.

6. ———: ———: ———: Instructions: Singling Out Testimony. In an action on a life insurance policy, where the petition alleged insured died on a certain day, and plaintiff did not undertake to prove such death by direct and positive proof, but sought to show it by proving that insured had been absent from home and family, unheard of, for over two years

from the date mentioned in the petition, and that his character, habits, condition, affections and attachments, etc., were such as to render his absence for any cause, other than death, improbable, it was proper to refuse to give an instruction offered by defendant, that if insured was seen alive after the date mentioned in the petition, plaintiff could not recover, for the reason it savored too strongly of singling out the testimony of one of defendant's witnesses, who testified he had seen insured two days after such date, and laid too much stress upon the exact day of insured's death; a finding that he died on or about the date alleged being sufficient, and defendant moreover having, by its admissions, made it manifest that the exact time of death was not deemed of any particular importance.

7. INSTRUCTIONS: Refusal: Singling Out Testimony: Contrary to Admissions. An instruction, which singles out certain testimony and which is contrary to admissions made by the party asking it, is properly refused.

8. APPELLATE PRACTICE: Admissions at Trial: Binding Effect: Life Insurance. In an action on a life insurance policy, where proof of death was based on insured's unexplained absence, defendant is not entitled, on appeal, to deny plaintiff's right to an amount provided in the policy for placing a monument at insured's grave, because there was no grave, where a claim for such amount was made in the petition and defendant stated at the trial the sole issue in the case was whether or not insured was dead.

9. ———: ———: ———. A right conceded at the trial cannot be attacked on appeal.

Appeal from St. Louis City Circuit Court.—*Hon. George H. Shields*, Judge.

Affirmed.

*Phil. H. Sheridan* and *Henry B. Davis* for appellant.

(1) The instruction in the nature of a demurrer to the evidence should have been given. Lancaster's Adm. v. Ins. Co., 62 Mo. 121; Hancock, Admr. v. American Life, 62 Mo. 26; Donaldson v. Lewis, 7 Mo. App. 403; Dickens v. Miller, 12 Mo. App. 408. (2) Instructions 2, 3, 4 and 5, offered by defendant, should have been given. It is charged in the petition that Spring-

meyer died on July 5th, 1905. (4) Instruction 1, given for plaintiff, is erroneous and in this connection the verdict is excessive because the $100 was to be paid for the placing of the monument over the grave of Springmeyer. Under the evidence Springmeyer, if dead, has no grave.

*Charles Fensky* for respondent.

(1) The instruction asked by defendant in the nature of demurrer to the evidence was properly refused. Authorities cited by appellant not applicable. Hancock, Admr. v. Ins. Co., 62 Mo. 26; Lancaster, Admr. v. Ins. Co., 62 Mo. 121; Carpenter v. Legion of Honor, 79 Mo. App. 597. (2) Instructions 2, 3, 4, and 5, were properly refused. The court gave same in its own. The instruction as to seven years presumption was not proper in this case. Biegler v. Legion of Honor, 57 Mo. App. 423; Lancaster v. Ins. Co., 62 Mo. 126.

STATEMENT.—The appeal in this case was prosecuted to this court, but was thereafter transferred by it to the Springfield Court of Appeals under the provisions of an act of the Legislature, approved June 12, 1909. [See Laws of Missouri 1909, p. 396; see, also, sec. 3939, R. S. 1909.] In due time the cause was disposed of by the Springfield Court of Appeals through an opinion prepared by Judge GRAY of that court, as will appear by reference to Springmeyer v. Sovereign Camp Woodmen of the World, 144 Mo. App. 483, 129 S. W. 273. Subsequently, the Supreme Court declared the said legislative act, which purported to authorize the transfer of cases from this court to the Springfield Court, to be unconstitutional. The cause was thereafter transferred by the Springfield Court of Appeals to this court on the theory that the jurisdiction of the appeal continued to reside here and the proceedings had in the Springfield Court with reference thereto were *coram non judice.*

The case has been argued and submitted here, and upon due consideration, we find ourselves unable to concur in the view expressed by the Springfield Court in the opinion above referred to.

The suit was filed August 10, 1907, in the circuit court of the city of St. Louis, being brought by Mary Springmeyer, the wife, alleged to be the widow, of Louis J. Springmeyer, as beneficiary, to recover the amount of a benefit certificate for $2000 death benefit and $100 additional for a monument, issued to Springmeyer by the defendant, a fraternal beneficiary association, on November 6, 1897. The plaintiff had verdict and judgment for $2186, being the amount of the death benefit and the monument fund and interest, and the defendant has appealed.

At the trial, the defendant admitted all the facts necessary to the plaintiff's recovery except the sole issue as to the death of Springmeyer, the insured, and did not plead or rely upon any condition of the policy rendering it void in case the insured committed suicide. It was charged in the petition that Springmeyer died on July 5, 1905. There was no direct and positive proof of Springmeyer's death; no witness who saw him die or dead; nor was he absent and unheard of for seven years. He was absent only some two years when the suit was brought. The case depends upon there having been proof of circumstances which made it more probable that Springmeyer died than that he survived.

The evidence adduced on the part of the plaintiff tended to prove, that at the time of his disappearance, July 5, 1905, Springmeyer was thirty-eight years of age, steady, sober and industrious, a laborer employed in the clarifying department of the St. Louis city waterworks, earning about sixty dollars a month, sufficient to make comfortable provision for himself and family in the simple manner of their living. He had a wife and two children, girls, one of the children be-

ing about nine and the other three years of age. He also had three sisters who lived in the same city in which he lived, the city of St. Louis. He was a member of the defendant order and of the Royal Arcanum. During the eleven years of his married life he lived constantly with his wife and children. At the time of his disappearance and for four years before that he and they lived in three rooms at 5322 Conde street. It was his habit to bring his wages home to his wife, getting from her his spending money as needed. He spent his evenings at home, except that some two nights a month he attended lodge meetings, and he and his wife would sometimes go out together to social entertainments or to visit friends or relatives. He was quite domestic in his tastes, delighting in feeding the chickens and working in the garden and helping with the children or in the rougher house work. He would even sit with his wife and help in her fancy work, having a knack for work of that kind. His health was good, except that the lime he worked in made sores on his body. He often visited his married sister's home, taking his wife and children with him. To those who knew him well, including his sisters, he appeared to be sociable and jolly, though quiet, and to be a fond and devoted husband and father, with a well kept, pleasant home, often speaking in terms of happy contentment and pride concerning his wife, children and home. So ran the testimony of his sisters, of a next-door neighbor, of a fellow workman and of a lodge intimate. Both the wife (the plaintiff) and the elder daughter testified for the plaintiff. They testified in effect that the wife and her husband always got along nicely, though they had quarrels "here and there like every family does;" that he was always kind and affectionate with the children, but, as to his disposition, "at times he was real nice and at times again he wasn't." He was of a melancholy disposition and at times would have "spells," when he would sit until late in the night in

moody and silent meditation. If he was provoked at these times, he would fly into a violent rage, would threaten to drown himself in the river and would even throw dishes at his wife or children or any one who came in his way; had thrown a chair at the baby. He had a strong dislike for the visits of his wife's relatives and would become violently angry on such occasions. The wife testified that she had no serious quarrels with her husband, that every one kept out of his way as much as possible when he had one of these "spells."

On the first, second and third days of July, 1905, the insured was under suspension from his work for the infraction of a rule. Of this he did not advise his wife, but left in the morning and returned in the evening as if he was working. On the 3rd of July, in the evening, the family were conversing about a cousin having rescued a man from drowning, when the daughter said, "Aren't people foolish to drown themselves, papa? They are always found, anyway." The insured replied, "That's the way I will do; some day I will be missing and if you want to find me you will find me at the bottom of the river with a rock around my neck." At this time he seemed happy and contented and had no "spell." The 4th of July he spent at home in apparent happiness, shooting fireworks with the children and spading in the garden. The 5th of July he was at work in his regular employment and returned home in the evening, bringing some candy for the children, as was his habit. The children had already eaten their supper and were playing out in front of the house. He and his wife ate their supper together. He ate hurriedly and said he was going to lodge, though neither of the lodges to which he belonged met that night. It was pay night and he handed his wife fifty dollars and a ten dollar rent receipt. He had on his oldest shoes, in bad condition, old and patched trowsers, an old hat and coat and no collar or

tie. He took his cigars and chewing tobacco out of his pocket, removed his wedding ring and detached his watch chain, and laid them all on the sideboard with the candy he had brought for the children. His wife offered him some money and the door key, and he declined both, saying he did not need either. He then told his wife good-bye and left the house. He stopped in front and kissed the children, the younger one more than once, and when the little one asked leave to accompany him he said she could not go because he was going to lodge, that he would be right back. He told them to go into the house and get the candy he had brought for them. He then walked south a half block to College avenue and turned east in the direction of the river—it being within walking distance—his wife watching him from the house. There is some evidence that that evening he was in a saloon on Broadway, which is nearer the river than his home, and that when he left the saloon he left by a door opening on to a street leading to the river, but whether this was before or after he had been home is not made clear by the evidence.

According to the evidence on the part of the plaintiff no trace of him was discovered from that evening of July 5, 1905, up to the time of the trial, April 15, 1908, though the fact of his disappearance and a description of him was published in all the city newspapers and in the official paper of the defendant order, the police of the city were notified and joined in the search, notices were sent to other cities and towns, the morgue, hospitals, etc., were visited, and inquiry was made of relatives and friends. No tidings have been received of him. On the other hand, a woman testified on behalf of defendant that the plaintiff had told her in an exchange of confidences that her husband broke dishes and then she turned around and broke dishes too. A man testified that the insured had told him of a woman whom he knew before he had

married this one and whom he thought more of, but that he had not said anything about going away with her; that he had intimated his home was not as pleasant as it might be, and had complained of his meals and of his wife's relatives imposing on his hospitality. Another witness testified that he had known the insured for six or seven years and had seen him on the 7th day of July, 1905, two days after he had left home, and that the insured told him he had quit work and was going to leave home; that he could not get along with his wife. On cross-examination this witness stated that he had never communicated this intelligence to the plaintiff though living within fifty yards of her house and passing there every day.

CAULFIELD, J. (after stating the facts).—I. Defendant assigns as error the action of the trial court in refusing to give its demurrer to the evidence, the defendant's theory being, that the evidence was insufficient to sustain a finding that the insured is dead. As we said in our statement of facts, there was no direct and positive proof of Springmeyer's death, and there is no room for the presumption of death which arises from the unexplained absence of a person, unheard of, for seven years, for here the suit was brought within the seven years. The presumption is, that Springmeyer is alive, and the burden of proof is on the plaintiff to establish the contrary.

In the absence of direct or positive proof, the fact of his death might be established in either of two modes: 1. By proof that at last accounts he was in a position of particular peril, as, for example, that he was dangerously ill, or exposed to great peril of disease or accident, etc., or even that he was near a river, despondent and threatening to kill himself. [Carpenter v. Sup. Council Legion of Honor, 79 Mo. App. 597, 602.] 2. By showing that the missing person's character, habits, condition, affections, attachments, etc.,

were such as to render his absence from home and family for any cause, other than his death, improbable. [Tisdale v. Conn. Mut. Life Ins. Co., 26 Iowa, 170; Hancock, Admr. v. Life Ins. Co., 62 Mo. 26; Lancaster, Admr. v. Life Ins. Co., 62 Mo. 121; Carpenter v. Supreme Council Legion of Honor, 79 Mo. App. 597; Winter v. Supreme Lodge Knights of Pythias, 96 Mo. App. 1, 69 S. W. 662; Bradley v. Modern Woodmen, 146 Mo. App. 428, 124 S. W. 69.]

We need not consider the first mode except, perhaps, incidentally. As to the second, defendant asserts that the evidence adduced did not disclose Springmeyer's character, habits, etc., in such a light as to render his voluntary abandonment of wife and children improbable, and, therefore, there was nothing which warranted submitting to the jury the question of his being dead. "In this case no such happy state of affairs existed as in the Tisdale case," says the defendant's counsel in his argument, and "unless the plaintiff can bring this case very close to the facts in the Tisdale case, we think the instruction for a nonsuit should have been given." The Tisdale case (Tisdale v. Conn. Mut. Life Ins. Co., 26 Iowa, 170) is an important one, for it gave to us the second mode above mentioned of proving or finding the fact of death. [See Hancock, Admr. v. Life Ins. Co., 62 Mo. 26.] In the Tisdale case, the missing man was of exemplary habits, excellent character, fair business prospects, respectably connected, and of the most happy domestic relations, and was living in apparent happiness, with no cause of discontent with his condition. But the facts are important only because they called for the application of the doctrine, that if a man's character, condition, affections and attachments be shown to be such that his unexplained absence from any other cause than death, is improbable, the jury may infer the fact of death from such absence, because of such improbability. It is not necessary that in this

case "such happy state of affairs existed as in the Tisdale case." It is sufficient if the missing man's character, condition, affections and attachments were such as to render improbable his unexplained absence from any other cause than death. In the case of Carpenter v. Sup. Council Legion of Honor, supra, this court reasoned that the very poverty, helplessness and despondency of the missing man rendered his absence from home and friends for any other cause than death improbable.

Nor are we impressed that the probabilities in question are ordinarily for the court to determine. There is no doubt that the circumstances of a case may not warrant the submission of the probability of death or the improbability of life to the jury. Such was held to be the case in Hancock v. Ins. Co., supra, where it appeared that the insured was to a large degree a wanderer with no family and no fixed and permanent place of abode. He had no ties to bind him to New York, where his relatives dwelt, and did have an incentive and had expressed an intention to go to the indefinite "South." But it would seem that for the trial court to refuse to submit the question to the jury, the insufficiency of the showing made to create the necessary improbability of life's continuance, must be so apparent that reasonable minds would not differ concerning such insufficiency. When the evidence is such that the question becomes dependent upon shades of character and condition, or degrees of affection or of strength of attachment, or of the comparative controlling influences of different affections or different attachments, and reasonable minds may well differ as to absence without death being probable under the circumstances disclosed, the question should be submitted to the jury. Thus, in Bradley v. Modern Woodmen, supra, this court, in a very carefully considered opinion by Judge GOODE, stated that even though the jury believed, as was testified by a witness, that the miss-

ing man had quarreled with his wife and threatened to leave home, the jury might not believe that he carried out his threat; "especially is this so," we said there, "because there is so much other evidence tending to prove the insured was happy in his domestic relations, strongly attached to his wife and children and without any motive to abandon them." Now, in the case at bar, the insured was a steady, sober, industrious workingman with regular employment at wages which gave comfortable provision for his family. He had had a fixed place of abode for years. During his entire married life of over eleven years he had abided with his wife and children, doing his duty by them. He was strongly domestic in his tastes and habits, spending his evenings at home with his family. He belonged to two fraternal orders and was a faithful attendant at their meetings. He belonged to this defendant order and had carried this insurance on his life for his wife's benefit for over seven years. He appeared to have been unusually devoted to his home and family, and liked to play with the children, helped his wife in her housework, gave her his monthly wage. His sisters lived in the same city. He visited them, and to them and others he expressed contentment with his home and family. In the face of all this evidence, showing a character and condition, affections and attachments which rendered his absence for any other cause than death improbable, we are asked to set aside this verdict and declare as a matter of law that this honest man was a base deserter of wife and children, a voluntary fugitive from the city which held all that would seem to make life dear, because his wife and child testified that he was not always happy, and was addicted without good cause to moody spells, when he would sit for hours in gloomy thought, or break into violent rages for slight cause, threatening to drown himself, and throwing things even at the baby to whom he was undoubtedly devoted; that he displayed anger

at the visits of his wife's relatives. We do not feel constrained to thus condemn him. Even if this conduct tended to show dissatisfaction with his home and family, it was for the jury to weigh it against the other abundant evidence of devotion and satisfaction; or, if they attributed most of it to a species of melancholia, which would rather induce suicide than a flight from home and family and friends, we would not upset their verdict, for that theory finds support in the significant manner of his going, and increases the improbability of his being alive. [See Carpenter v. Supreme Council Legion of Honor, 79 Mo. App. 597.] The demurrer to the evidence was properly refused.

II. The case was well and fairly submitted to the jury by the instructions given at the request of the plaintiff, but we may notice one, offered by the defendant, the refusal of which the defendant assigns as error. It told the jury that if they believed from the evidence "that Springmeyer was seen alive after the 5th day of July, 1905," they should find for the defendant. This instruction seems to savor too strongly of singling out and giving prominence to the testimony of one of the defendant's witnesses, and to lay too much stress upon the exact day of Springmeyer's death. There is no question here of the payment of dues or premiums, and we see no reason why a finding that he died on or about July 5, 1905, was not sufficient. Such a finding was what the instructions given called for. That the exact time of the death was not deemed of any particular importance by defendant at the trial is indicated by the language of its admission as follows: "Mr. Davis: (reads answer of the defendant.) "If the court please, so far as formal proof is concerned, I will state that the only issue in this case is whether Louis Springmeyer *is* dead or not, and I think that so far as the issue is concerned, the fact that the organization issued a certificate to him,

that he was a member of the Woodmen of the World, is admitted, and we simply take issue on the question of whether or not he *is* dead and it will simplify the case on that admission, I think. The whole issue in the case may be riveted down to the question of whether Louis Springmeyer *is* living or dead." By the Court: "That is, you admit that the certificate was issued?" By Mr. Davis: "We admit that the certificate was issued and that if he *is* dead the widow is entitled to it, and if he is alive, she is not." By the Court: "They have complied with the conditions of the policy?" By Mr. Davis: "Yes, we will concede everything except the death of Springmeyer, and that is the issue in this case." By Mr. Fensky: "It is also conceded that Mary Springmeyer is the widow, was the wife of Louis Springmeyer." By Mr. Davis: "Oh, yes, we will admit that." (The italics are our own.) We see no error in the refusal of this instruction.

III. The instructions given by the court allowed the jury to find, and the jury did find, for the plaintiff in the full amount prayed, including the $100 which the certificate provided should be paid "for the placing of a monument at his (Springmeyer's) grave." Defendant asserts that there was no grave and that therefore this $100 allowance was excessive. This point is not open to the defendant. Its admission of plaintiff's right to recover if Springmeyer is dead is broad and unqualified, and must be construed as conceding the plaintiff's right to have the full amount as prayed, if Springmeyer is dead. No intimation to the contrary was given at the trial or in the instructions offered by the defendant, so we conclude that such right was conceded at the trial and cannot be attacked on this appeal. In this respect we may add, however, that plaintiff's counsel in his brief asserts that the parties have stipulated that the, $100 may be deducted

from the final judgment, and nothing we have said is to be taken as diminishing the force and effect of that stipulation. The judgment is affirmed. *Reynolds, P. J.,* and *Nortoni, J.,* concur.