EUNICE FERRIL, Executrix of the Estate of CLIFFORD HIX, v. KANSAS CITY LIFE INSURANCE COMPANY, Appellant.—137 S. W. (2d) 577.

Division One, March 6, 1940.

*F. M. Frisby, J. W. McKnight* and *McAllister, Humphrey, Pew & Broaddus* for appellant.

*F. P. Stapleton* and *DuBois & Miller* for respondent.

HYDE, C.—This is an action on a $10,000 insurance policy on the life of Clifford Hix, payable to his estate. Plaintiff, his wife, sued as executrix named in his will. The verdict was for plaintiff for $10,443, and defendant has appealed from the judgment entered.

Defendant contends that there was no substantial evidence that Hix died on May 6, 1927 (as alleged by plaintiff), or at any time while the policy was in force (it was paid up to June 25, 1927), and that its demurrer to the evidence, at the close of the case, should have been sustained. Hix disappeared on the night of May 6, 1927, and had not been seen (defendant had testimony that he was seen in Kansas City later in that month) nor heard from during a period of more than ten years preceding the trial of this case in January, 1938. After his absence had continued more than seven years, his will (made in 1917) was probated and letters testamentary were issued to plaintiff in April, 1937. Proof of death (in form of plaintiff's affidavit and copy of letters) was then submitted to defendant, and, upon rejection of plaintiff's claim, this suit was brought during that month. Because of defendant's contention, we hereafter state the facts which the evidence tended to establish when considered most favorably to plaintiff.

Hix was thirty-two years old at the time of his disappearance. He married plaintiff in 1916 soon after they both graduated from high school at Bethany. They went to school at the Teachers' College at Maryville for a year and, in 1917, went to New Cambria where Hix taught school. In 1918 he enlisted in the United States Army and was stationed at Camp Raritan, New Jersey. Plaintiff went there with him. In January, 1919, plaintiff's father died and she inherited a considerable estate consisting of 320 acres of land in Harrison County and between five and six thousand dollars in money. After Hix was discharged from the Army, they went to Columbia where Hix attended the law school of the University of Missouri for two years. Thereafter, he passed the bar examinations, was admitted to the bar, came back to Bethany and opened a law office. He also had an insurance and farm loan agency. Hix soon began to invest rather heavily in real estate, buying two farms in Harrison County and several residence properties in Bethany. To finance these purchases and improvements on the farms, plaintiff's land was mortgaged for $20,000. Mortgages were assumed by Hix on some of the properties purchased, and in other transactions new mortgages were made, on the properties purchased, to the Bethany Building & Loan

Association. These provided for monthly payments to which the rentals of the properties were applied.

In 1924 Hix was elected Prosecuting Attorney of Harrison County. This office paid a salary of $2500 per year. Hix was a vigorous prosecutor, and having made campaign promises to "down the bootleggers," thriving during the national prohibition era, he filed a number of charges in liquor cases against alleged liquor law violators. He also filed several charges of automobile theft against persons alleged to have been connected with a "car theft ring" operating in Harrison, Livingston and adjoining counties. It was shown that this aroused considerable antagonism, and on one occasion Hix was assaulted on the Bethany fairgrounds by a man he had "prosecuted on some bootlegging charge." A lawyer in Bethany testified "Clifford Hix told me he was afraid he would be bumped off. He told me he was afraid of his life." This lawyer knew the man who had assaulted Hix, and others he had prosecuted, and expressed his opinion as to one of them that "he was the kind of a fellow that would bump a fellow off." In the primary election in 1926 Hix was defeated for the nomination for another term as prosecuting attorney. His father explained this, as follows: "He was pretty hard on bootleggers and the next time they put him out." Immediately after the primary Hix told his successful opponent that he was going to resign and asked him to apply for appointment. His opponent said: "He didn't seem to be unfriendly or sore at me. He joked about it—that the people didn't want him or they would have nominated him." Another lawyer, who tried to persuade him not to resign, said: "He told me he had sufficient business and property to resign." He did resign the week after the primary and his successful opponent was appointed by the Governor for his unexpired term.

It was defendant's theory that after this time Hix became despondent, drank heavily and took no pride in his personal appearance, although he was previously a very neat dresser. Plaintiff, however, testified that he was always a very clean and well dressed man and that he did not change in any way after his defeat; that he was at all times very temperate in the use of liquor; and that he never smoked and "was particularly proud of never having tasted tobacco." Plaintiff had testimony of Bethany lawyers and other close associates of Hix to the same effect. Hix was a member of the American Legion post at Bethany and took an active part in it. He was also an active member of the Masonic Lodge. He taught a boys' Sunday school class, and, for their use, he equipped the basement of his home for boxing and wrestling, with a punching bag and also a basket ball practice ring. He frequently entertained the members of his class there. Plaintiff, and others, testified that their home life was pleasant; that she and Hix went to dances and entertainments together; that he never stayed away from home except a few times

when he would stop at the farms overnight; and that there was no change whatever in their relations prior to his disappearance.

Hix was shown to be industrious and enthusiastic about anything he undertook. It had been his ambition from boyhood to be a lawyer. He maintained an office of several rooms, employed a stenographer, and had a library estimated as worth $3000, including Missouri Reports, Corpus Juris, American Digest System, and American Law Reports. He was also very much interested in farming and put in considerable time looking after farm operations. On the 160-acre farm that he had purchased in the western part of Harrison County, he had a herd of purebred Jersey cattle (purchased from W. P. Stapleton of Albany) and also some registered spotted Poland China hogs. He exhibited some of these cattle at the Bethany Fair in the fall of 1926. He also had sheep on another farm he owned in the northern part of Harrison County. On his wife's farm, three and one-half miles east of Bethany, he had seventy or eighty head of Shorthorn cattle and as many purebred red hogs which he owned in partnership with the tenant who operated the farm on a livestock share contract. Hix built a modern hog house and corn cribs on this farm at a cost of about $2000. His tenant said that he was on this farm five years and that during that time he and Hix each made an average profit above expenses of more than $1000 per year.

On the night of May 5, 1927, Hix took one of his registered Poland China sows to the farm of Tom Hall in Gentry County, west of Albany. He had met Hall at the Bethany Fair and learned that he had a very fine male hog. Hix often hauled stock and farming equipment from one farm to another either in his car, a Model T coupe, or in a trailer. Just before he reached Hall's farm, the sow broke out of the crate in which she was being hauled on the side of Hix's car and escaped to the farm of J. W. Summa. Hix and Summa chased the sow for about an hour over the Summa farm and through barbed-wire fences before they caught her and got her into Summa's barn. Hix then went to Hall's farm, requested him to go to Summa's barn, get the sow and take her to his place, which he did. Hix did not return home that night until after midnight. Both Hall and Summa testified that they did not see any wounds or blood about the sow or on Hix's hands or face. Plaintiff also testified that Hix did not have any injuries on his hands, the next morning. She said that he was tired the next day, Friday May 6, 1929, but went to his office and attended to his ordinary business. The May Term of the Harrison County Circuit Court was to start on Monday, May 9th, and there were several cases on the docket in which he had been employed.

Hix ate all his meals at home on Friday, May 6th, as usual, having his evening meal about 6:30. He had an appointment for that evening with W. P. Stapleton at Albany, who had a chattel mortgage on some of his Jersey cattle for a part of the original purchase price.

Between 8 and 8:30 P. M. he started for Albany. He took no clothes or luggage with him, not even his fountain pen. Plaintiff went with him to his office because he asked her to stay there to deliver an insurance policy to "someone who was living quite a distance away" and intended to call for it that evening. When he left, Hix told plaintiff that "he would be home—he thought rather early." Hix drove to a garage a few blocks west of his office and stopped to have his lights fixed. This garage was operated by a friend of his, who was one of his fellow members of the American Legion and who took care of his car. Hix was driving his Model T Ford coupe which was about two years old and which, according to this garageman, "was in very good shape." Hix never reached Albany that night, which fact plaintiff learned the next day when she phoned Mr. Stapleton after finding that Hix had not returned from his trip.

Between one and two o'clock on the morning of May 7th, John Vandiver, driving a truckload of stock to St. Joseph, saw a hat at the side of the highway and stopped to pick it up. The hat had the name "C. Hix" in ink on the band and there was blood on the top of the hat in the fold and on the side. The point where the hat was found was in Gentry County, on the main highway between Bethany and Albany, more than a mile west of the Harrison County line, at a place where the highway ran next to the railroad tracks. Vandiver took the hat with him to St. Joseph and back to his home at Eagleville. On Monday, May 9th, Vandiver was back in Bethany and told about finding the hat. Plaintiff on that day "went back to Hix's office because it was the first day of court and . . . there would be clients coming in." She said that she "could not convince anyone anything much was wrong," and that her "brother and Uncle tried to assure (her) he would be back." Mr. Charles Miller, an attorney, told plaintiff about the hat and went with plaintiff and some of her relatives to Eagleville to get the hat. Plaintiff identified it as the hat her husband was wearing when he left for Albany. Mr. Miller described its condition as follows: "Considerable blood was on the top of the hat and in addition to the blood I saw what I thought was brains. . . . I noticed gray matter." This hat was produced at the trial, but it had been cleaned by Hix's mother, who got it from the coroner sometime after his disappearance.

Plaintiff's brother and uncle then went out to investigate the place where Vandiver had found the hat. Plaintiff's brother described their subsequent search as follows: "We drove on to St. Joe and investigated up and down the line and I went to all of the garages trying to locate the car and came back the next day and looked along the ditches and out in a radius of a little ways from the road and in a day or two we got a bunch of American Legion boys and scoured that country and in a day or two down below Pattonsburg." Later in the week it was learned that a highway maintenance man in

Livingston County had found a Model T coupe on the bank of Grand River about four miles west of Chillicothe and that when it was taken to Chillicothe by the police some of Hix's campaign cards were found in it. Grand River had been in flood, and while in its banks on May 6th, it was still about four feet higher than normal flow. Plaintiff's brother went there with the sheriff of Harrison County, Hix's father and others, identified the car and brought it home. He described the condition of the car as follows: "Mud was all over the running board and there was a glass broken out on the driver's side of the car. Two bullet holes in the right hand side of the car—three. Two went through the car; one in the door and one in the corner—over at the corner of the seat—just above the cushion—just next to the cushion and one in the door. . . . Blood spots on the back (of the seat) and this car cushion had creased where the blood had dried."

The only evidence as to how the Hix car reached Livingston County was the testimony of R. E. Dobbins, produced as a witness by defendant. In May, 1927, he was operating a road excavator near Utica for a construction company which was building Highway 36 through Livingston County. On the night of May 6th he was in Gallatin with his son-in-law Lewis Johnson and about midnight they started to walk to Wabash Crossing, about two miles from Gallatin, to catch a train for Chillicothe. This train went through Gallatin about 1 o'clock and reached Chillicothe about 1:45 A. M. As they were walking down the hill about a mile from Gallatin he said: "A Model T Ford came up (he said it overtook them) and stopped and (the driver) asked if we could show him the way to Chillicothe and we got to talking and he said we could ride with him and we got in the coupe and went through Utica." The roads were muddy from recent rains and they reached Utica about 1:30 A. M. Dobbins got out of the car at Utica and Johnson rode on with the driver. Dobbins said that the driver of the car had a cold, was a little hoarse, and had a bandage around his left hand. He said that this man "smoked one cigarette after another . . . he smoked one part way down and then smoked another." Dobbins also said that "a glass was broken out of the left hand door next to the driver's side." He learned later from Johnson that the car ran out of gas before reaching Chillicothe and was left on the road. Soon after that Dobbins was shown a picture of Hix and asked if he could identify that as the man he rode with. He said: "At first I said I could not—but let's see—it seems to me—that has been ten years ago—but it seems to me I identified that picture, but I will not make a definite statement on that—that is just my recollection." Johnson had moved to Mississippi and his evidence was not available at the trial. In this connection, we note that plaintiff had evidence to show that Hix was familiar with the road to Gallatin and Chillicothe; that

he did not smoke; that he did not have a cold; and that he had no injury to his hands.

Defendant had evidence tending to show that Hix was seen in Chillicothe on the night of May 6, 1927, and left there on the 1:45 A. M. train for Moberly; and also that he was seen driving a car in the traffic at night along Twelfth Street in Kansas City later in the month of May, 1927. The evidence as to this latter identification (made by four Bethany people while in a parked car on Twelfth Street) was somewhat weakened by the fact that they had all been drinking prohibition bootlegged liquor. The Chillicothe identification was made, from pictures of Hix, by a railroad ticket agent at the depot and by a man who was operating a restaurant (with rooms above) nearby. The agent said he saw the man (whom he said looked like Hix's picture) in the depot when he came to work shortly before 11:00 P. M.; that this man bought a ticket from the agent later relieved by him; that he afterwards saw this man in the restaurant; and that he saw him get on the 1:45 A. M. train. (It does not seem possible that the man driving Hix's car, who picked up Dobbins and Johnson about midnight at Gallatin, could have been in Chillicothe at this time, since he had to drive thirty miles over muddy roads to Utica and then walk four miles.) The man in charge of the restaurant testified that the man (he thought was Hix from his picture) came in shortly after midnight and asked for a room; that he showed him to a room but that he only occupied it about fifteen minutes; that he came down and got something to eat, paid for his room, and left before time for the train; and that he was only there from "forty-five minutes to an hour all told." However, this restaurant man said that the man, whom he identified from Hix's picture, was not the man who was in the restaurant with Johnson that night. According to the chief of police of Chillicothe and others, who testified for plaintiff in rebuttal, this restaurant man did not make any identification from Hix's pictures at the time his disappearance was being investigated. There was also testimony that he said "this man in the restaurant would have weighed two hundred pounds." Hix was under medium height and weighed about 140 pounds. Obviously, the accuracy of these identifications, was for the jury.

The search for Hix continued for some time. Plaintiff went to Kansas City and to St. Joseph and "looked at some dead bodies." His parents made trips to other states and advertised in the Kansas City papers. Reporters from metropolitan newspapers made investigations at Bethany and Chillicothe and gave considerable publicity to his disappearance. A brother of Hix, who was a lawyer in the State of California, came to Bethany and "tried to help." Defendant had a detective investigate the case after this suit was commenced. With all these efforts, no trace was found after May, 1927. Soon after his disappearance, some of Hix's creditors brought

attachment suits, and a receiver was appointed to take charge of his property. Later bankruptcy proceedings were begun and his property was liquidated and distributed through the bankruptcy court. Eventually the real estate mortgages were foreclosed, including the one on plaintiff's farm. Plaintiff employed as her attorney Randall Wilson of Bethany, and upon his advice filed a claim in bankruptcy for $300 in lieu of specific exemptions, which was allowed and paid. Plaintiff and Hix had no children and after the bankruptcy proceedings plaintiff attempted to obtain employment. She said she was advised that she could be more successful in getting a job if she got a divorce. In October, 1929, she obtained a divorce decree, with restoration of her maiden name, on the ground of desertion, being again represented by Mr. Wilson. She later (December, 1929) remarried. It was shown that the United States Veterans Administration, on January 1, 1925, issued to Hix an adjusted service certificate of the face value of $477, and that Hix had never made a claim for payment under the act of January 27, 1936, or for a loan prior thereto.

Defendant's theory was that the disappearance of Hix was due to his financial situation. Defendant says:

"There are abundant circumstances in this case from which reasonable minds can draw the inference that the absence of Hix was voluntary and his absence may be accounted for on a very rational theory other than that of his death. The evidence is undisputed that he had squandered his wife's money. He was in debt at least to the extent of $50,000.00. He had reached the point where he could not raise a dollar. Everything he had an interest in was covered by mortgage. The $25.00 check which he gave to Mr. Barlow, dated April 27, just seven days before he disappeared, was worthless. It was shown he was indebted to many tradespeople on accounts, running from one to three years. A little over a month before he disappeared he had wrongfully converted to his own use $270.00 that belonged to DuBois & Miller. When defeated for re-nomination for prosecuting attorney at the primary, he felt the people of his community had turned against him and immediately resigned his office. On the evening of the night insured disappeared he was to come to Albany to see Mr. Stapleton relative to a past due note secured by chattel mortgage on cattle. Mr. Stapleton had been and was then demanding payment, and we are entitled to draw the inference he was threatening foreclosure."

While the jury could reasonably draw from the evidence some of these inferences stated by defendant, nevertheless it is clear that contrary inferences would be warranted. Plaintiff had evidence tending to show that the real estate owned by Hix and his wife was worth, upon the then existing level of values, at least $25,000 more than the mortgages. These real estate mortgages amounted to

about $40,000, the chattel mortgages to $3,800, and $6000, was due to his wife's mother for her interest in the land mortgaged. Hix had paid $14,000 for his 160-acre farm and the mortgage on it which he assumed was $8000. His wife's farm, mortgage for $20,000, was shown to be worth from $30,000 to $32,000. His real estate in Bethany, consisting of residence properties, brought rentals sufficient to take care of the monthly payments on the building and loan mortgages and these payments continuously reduced the principal balance due. It was not shown that any of these mortgages were ever in default; and he had substantial equities in these properties. With reference to the $25 check given to Mr. Barlow, it was shown that this had never been presented to any bank for payment; that it was given for the payment required with an application for a new building and loan mortgage; that Mr. Barlow had sent in his own check to the company for this amount and was holding Hix's check until the loan was approved; and that he expected to be repaid out of the loan proceeds. It was further shown that two banks in Bethany had closed in April, 1927, shortly before that time; that Hix had previously arranged for a loan at one of them to take up the Stapleton chattel mortgage; and that because of this bank closing he had to make other arrangements with Mr. Stapleton, which was the reason for the appointment with him on May 6th. It was also shown that after Hix's disappearance, and after attachment suits had been brought, a foreclosure sale under this chattel mortgage brought over $1600 more than necessary to pay the debt, and that this excess was paid to the receiver appointed by the court. It was also shown that there was sufficient property covered by the other two chattel mortgages ($1800 to Walton Trust Company and $1000 to the First National Bank) to pay them; that there was livestock free from mortgage on his wife's farm; and that more then $1700 was turned over to the referee from the proceeds of the sale of this stock. Additional amounts (about $500) were also received for the sale of grain on this farm. It was also shown that Hix had two 10-acre tracts of land which were unincumbered. As to the $270 belonging to DuBois & Miller, it was shown that this firm was allowed a preferred claim for that amount in the bankruptcy proceedings for their part of a fee collected by Hix; but that this was collected on a note made out to Hix for fees in a case in which Hix was originally employed and in which he had later associated this firm with him. (We also note that this firm represents plaintiff in this case.) The amounts due on local accounts ranged from $11.20 to $415.55 (notes were held for some of these) and were owed to eight firms and did not total as much as $1000. Certainly whether or not his financial situation was the cause of his disappearance was for the jury. Defendant also says that, since there was no evidence of an analysis of the spots and stains on Hix's hat or on his car seat cushions, that these might have been made

by some other substance than blood or if it was blood it might have been animal blood. However, various witnesses described the appearance and location of these stains and the fact that there were bullet holes in the car was some corroboration of plaintiff's theory. The accuracy, weight and credibility of this testimony was for the jury.

This being true, the question is whether the facts above stated, together with such inferences as might reasonably be drawn therefrom, amount to substantial evidence that Hix died while the policy was in force, and, as plaintiff's instructions required the jury to find, on the night of May 6, 1927. Defendant relies upon Tillotson v. Travelers Ins. Co., 304 Mo. 487, 263 S. W. 819, in which it was said that in either a criminal or civil case, "where murder is charged, there must of necessity be substantial evidence of the *corpus delicti*, to take the case to the jury." However, in the Tillotson case, the insured had not been absent seven years. For that reason, this court said, concerning the injured, "*he is presumed to be still alive*, and there is no legal presumption of his death merely from lapse of time, prior to the expiration of said seven years." We do not think that this ruling in the Tillotson case should apply here, because the common law presumption of death, arising from the seven years' unexplained absence of Hix made a prima facie case that he was dead. [See Sec. 1709, R. S. 1929; 16 Am. Jur. 19-32, secs. 18-38; 17 C. J. 1165-1175, secs. 2-19; Cobble v. Royal Neighbors, 291 Mo. 125, 236 S. W. 306.] Moreover, the Tillotson case was a suit on an accident policy and it was necessary to prove that "death was caused by external violence and accidental means," which would certainly require a showing of something more than absence. This court said of the evidence in that case:

"We hold there is no substantial evidence of such murderous assault and drowning of Tillotson. It is true, plaintiff's evidence shows his clothing was badly torn and his pocketbook empty. But it is also true that it shows the place on the river bank, where they were found, indicated no signs of the struggle, which must have been of a strenuous character to tear and strip his trousers, as well as his coat, from his body. The weeds and the bushes were not trampled down, and there was no blood on the ground or the rocks where his clothing was found or nearby, nor was there any evidence introduced, showing any blood upon his clothes, so found, or that anyone heard any outcry. All the indications of a murderous attack and struggle are seemingly missing."

Clearly that is not the situation here. Plaintiff had the benefit of the presumption, from Hix's seven years' absence unheard of and without trace, that Hix was dead. Of course, there was no presumption as to the time of his death. [Williams v. National Life & Accident Ins. Co., 222 Mo. App. 355, 1 S. W. (2d) 1034; Goodloe v.

Metropolitan Life Ins. Co. (Mo. App.), 115 S. W. (2d) 11.] But plaintiff's evidence showed the very circumstances, indicating death by violence at the time of his disappearance, that this court said were lacking in the Tillotson case. There was evidence of blood on the hat he was wearing and on the seat of the car he was driving and there were bullet holes through the door. As said in the Williams case, "the time of death . . . may be established by facts and circumstances inconsistent with insured's abandonment of his home, desertion of his friends, and the concealing of his whereabouts from them." Plaintiff not only had substantial evidence of that character but in addition also had the above-noted corroborating "indications of a murderous attack," as well as testimony tending to show a motive for such an attack by persons capable of making it. [See Hancock v. American Life Ins. Co., 62 Mo. 26; Bonslett v. N. Y. Life Ins. Co. (Mo.), 190 S. W. (2d) 870; Bradley v. Modern Woodmen, 146 Mo. App. 428, 124 S. W. 69; Springmeyer v. W. O. W., 163 Mo. App. 338, 143 S. W. 872; Johnson v. Modern Woodmen, 163 Mo. App. 728, 147 S. W. 510; Bergman v. Supreme Tent, etc., 203 Mo. App. 685, 220 S. W. 1029; Schell v. Metropolitan Life Ins. Co. (Mo. App.), 3 S. W. (2d) 269; Karst v. Chicago Fraternal Life Assn. (Mo. App.), 40 S. W. (2d) 732; Grandgenett v. National Protective Co. (Mo. App.), 73 S. W. (2d) 341; Miller v. Mutual Life Ins. Co. (Mo. App.), 79 S. W. (2d) 750; Annotations 34 A. L. R. 1389, 61 A. L. R. 1327; 75 A. L. R. 632; Kansas City Life Ins. Co. v. Marshall (Colo.), 268 Pac. 529, 61 A. L. R. 1321; American National Life Ins. Co. v. Hicks (Tex.), 35 S. W. (2d) 128, 75 A. L. R. 623.] We hold that plaintiff's showing was substantial evidence sufficient to make a case for the jury on the issue of whether Hix died on the night of his disappearance and warranted a finding that his death occurred at that time.

Defendant also assigns error in giving plaintiff's main Instruction A which directed a verdict upon certain findings being made. The criticized part of the instruction is as follows:

"The court instructs you that the plaintiff must prove by a preponderance or greater weight of the evidence that the said Clifford Hix died in Gentry County, Missouri, on the night of May 6, 1927, and you are further instructed that this fact may be established by facts and circumstances inconsistent with assured's abandonment of his home, desertion of his friends, and concealment of his whereabouts from them and in this connection you may take into consideration his age, health, disposition, moral character, social rank, financial condition, objects and aims in life, together with all other facts and circumstances in evidence, which would be inconsistent with his voluntary absence. These facts and circumstances must be taken into consideration in passing upon the question whether or not the said Clifford Hix died on the night of May 6, 1927. Therefore, if

you believe and find from the evidence that the said Clifford Hix died. on the night of May 6, 1927," etc. (stating other findings).

Defendant's contention is as follows:

"Had this instruction said that in passing upon the question of whether or not insured died on the night of May 6, 1927, you should take into consideration all the facts and circumstances in evidence it would have been proper. Instead of doing that, it singles out, limits and restricts the jury to a consideration only of those facts and circumstances which would be 'inconsistent' with insured's voluntary absence. The other facts and circumstances which were in evidence and which were perfectly consistent with insured's voluntary absence, such as the squandering of his wife's money, his being burdened by debt, his thought that the people of his county were against him, his embezzlement, his giving of a small worthless check, etc., are to be ignored and need not be considered by the jury under this instruction. In addition to this, it is in direct conflict with defendant's Instruction No. 5, which directed the jury to take into consideration 'all the facts and circumstances in evidence.' "

We do not think that stating that facts and circumstances, of the general character referred to in this instruction, "must be taken into consideration" by the jury is the same thing as stating that the jury must not consider any facts and circumstances other than these, which is the meaning given to it by defendant. A somewhat similar contention was made against an instruction, and overruled by this court in Philibert v. Benjamin Ansehl Co., 342 Mo. 1239, 119 S. W. (2d) 797. The jury to properly perform its functions must consider everything in evidence but, in considering it all, it should decide which evidence is the most credible and base its verdict on that, rejecting evidence conflicting it. Substantially this same instruction was given in Karst v. Chicago Fraternal Life Assn. (Mo. App.), 40 S. W. (2d) 732, and the contention that it was a comment on the evidence was overruled therein by the Springfield Court of Appeals. We think it would be better form for such an instruction to require a direct finding that the "insured's abandonment of his home," etc., and "his age, health," etc., *were inconsistent* with his voluntary absence, and to state that they must so find before they could find that "Hix died on the night of May 6, 1927." However, we believe that, in this case, the jury would so understand it, both because of the burden of proof instructions given and because of the requirements of defendant's Instructions 4 and 5. Instruction 4 told the jury that to find for plaintiff they "must find and believe from the evidence that the absence of Clifford Hix from the time of his departure was without motive and was improbable upon any other theory, . . . . than that he was dead." Instruction 5 told them: "If you find and believe from the evidence that it is equally as probable that the said Clifford Hix absented or absconded himself on the night of May 6,

1927, as that he might have died on said night, then your verdict should be for the defendant." Defendant's Instruction 5 also stated: "In determining this issue, you should take into consideration all the facts and circumstances in evidence relative to the health, age, habits, disposition, manner of living, pecuniary circumstances, family relations and mental attitude of Clifford Hix." Thus defendant required consideration of the same character of circumstances referred to in plaintiff's instruction. We, therefore, overrule defendant's assignment that there was prejudicial error in giving plaintiff's main instruction.

Defendant also makes assignments of error of admitting in evidence the Letters Testamentary issued to plaintiff, and plaintiff's affidavit sent to defendant for proof of death prior to commencement of suit. Plaintiff's affidavit stating the circumstances of Hix's disappearance and her claim that he had been murdered and a copy of the Letters Testamentary were attached together as one document and filed with defendant (April 8, 1937), after more than seven years of absence had elapsed. They were so offered in evidence. When it was offered, objection was made on the ground that plaintiff's appointment as executrix had been admitted by the answer; that the proof of death was not an issue in the case under the pleadings (because this is an affirmative defense); and that it had "no bearing other than an attempt to prove death" by improper evidence. (There was an allegation of due proof in the petition and a general denial in the answer.) Plaintiff's counsel then asked: "Are you conceding we made due proof of his death?" Defendant's counsel answered: "We say it is no issue under these pleadings." Plaintiff's counsel replied: "We say on due proof of his death, we are entitled to interest." The court then admitted the document containing both the Letters and the affidavit. Of course, it was proper to show that due proof of death had been made in order to prove liability for interest, and perhaps (depending upon construction of the policy provisions) also the accrual of plaintiff's cause of action. [Martin v. Modern Woodmen, 158 Mo. App. 468, 139 S. W. 231; Schell v. Metropolitan Life Ins. Co. (Mo. App.), 3 S. W. (2d) 269; see also Bonslett v. New York Life Ins. Co. (Mo.), 190 S. W. 870; Jacoby v. New York Life Ins. Co., 229 Mo. App. 333, 77 S. W. (2d) 840.]

This court recently said in State ex rel. Kansas City Public Service Co. v. Shain, 345 Mo. 543, 134 S. W. (2d) 58, decided at September Term, 1939.:

"The rule is recognized and established by many decisions of this court that where evidence is admissible for one purpose or one issue but would be improper for other purposes and upon other issues in the case, it should be received. The opponent then has a right to an instruction if he should request it limiting the extent to which and the purpose for which the jury may consider such evidence.

[Moore v. St. Joseph, etc., Railway Co., 268 Mo. 31, 186 S. W. 1035; Union Savings Association v. Edwards, 47 Mo. 445, l. c. 449; Wilkins v. Railway Co., 101 Mo. 93, l. c. 106, 13 S. W. 893; Wigmore on Evidence (2 Ed.), sec. 13.]"

Defendant could have prevented the admission of this document by admitting that this proof of death was proper in form to satisfy the company's requirement of full statement of circumstances upon which plaintiff relied, without any admission of either the fact of death or time of death. It could also have had an instruction limiting its effect if it had then considered its. effect might be prejudicial. As to the admission of the Letters Testamentary as a part of the proof of death, we do not think this could have been prejudicial because it was a conceded fact in the case that they had been issued and because the jury would necessarily know that plaintiff could not sue as executrix without being appointed. Of course, the Letters were issued on the theory that Hix was dead, because of the presumption of death arising from seven years' absence under the common law, but neither that presumption (to which plaintiff was entitled under the evidence) nor the issuance of these Letters showed anything about the time of death which was the real fact issue for the jury to determine. The situation was similar to that in State ex rel. Kansas City Public Service Company v. Shain, supra, where this court held that it was not prejudicial for the jury to be told that one of the parties was fined in police court when his representation on appeal by his employer's attorney was competent on the question of agency, saying:

"As respondents contend in their opinion, the jury must necessarily have known that Sparks was convicted from the fact that he took an appeal. Obviously a successful litigant cannot appeal. Therefore the cause of defendants cannot have been prejudiced by telling them directly that which in the nature of things they had to know anyway."

Therefore, these assignments must be overruled.

The judgment is affirmed. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.